[Civil No. 2559. Filed April 11, 1927.]

[254 Pac. 1056.]

J. L. B. ALEXANDER, Appellant, v. S. K. PHILLIPS, C. S. STEWARD and J. T. BONE, Composing the Board of Supervisors of Maricopa County, State of Arizona, J. A. RIGGINS, LOUIE GAGE DENNETT, R. C. STANFORD, AMOS A. BETTS, H. C. BALDWIN, Composing the Board of Education of Phoenix Union High School District of Maricopa County, State of Arizona, and PHOENIX UNION HIGH SCHOOL DISTRICT, a Municipal Corporation, Appellees.

504

Mr. J. L. B. Alexander (Mr. Will E. Ryan, of Counsel), for Appellant.

Mr. George T. Wilson, County Attorney, Mr. Henry J. Sullivan, Deputy County Attorney, Messrs. Cunningham & Carson and Mr. E. S. Clark, for Appellees.

LOCKWOOD, J.—Plaintiff brought this action for the purpose of restraining the issue of some $80,000 in bonds of the Phoenix union high school district of Maricopa county, Arizona. After setting up the necessary formal matters in regard to parties plaintiff and defendant, his complaint, in substance, is as follows:

On the second day of December, 1925, the board of education of Phoenix union high school district, at a regular meeting, adopted a resolution whereby an election was called for the purpose of submitting to the electors qualified to vote thereon the following question:

"Shall the bonds of the Phoenix union high school district be issued in the amount of eighty-thousand and no–100 dollars ($80,000.00) for the purpose of erecting a stadium for the Phoenix union high school?"

The election was held on the twenty-eighth day of December, and, of the total number of votes cast, 652 were in favor of issuing the bonds, and 630 against such issue. The result was duly canvassed and certified to the board of supervisors as provided by law. The complaint then alleged that in one of the precincts of said union high school district "sixty or more of said votes cast therein and thereat were illegally cast by persons who were not *bona fide* taxpayers of the said Phoenix union high school district and had not paid in their own name a county or state tax on property situated within said Phoenix union high school district, other than poll, road, or school tax during the preceding year," and that the judges of the election made no effort to see whether such persons were qualified as set forth in the above quotation, and that, if such illegal votes had not been cast and counted, the bonds would not have carried. It was further alleged that, under the laws of the state of Arizona, the bonds of a union high school district cannot be issued for the purpose set forth in the proposition submitted to the voters, and plaintiff as a taxpayer prayed for an injunction against the issuance of the bonds or the incurring by defendants of any further expense whatever, to be paid by the district, for the planning or building of a stadium.

Defendants interposed several demurrers, general and special, to the complaint, and set up in answer that a stadium was within the purpose for which union high school districts are authorized to issue bonds and expend public money. The lower court sustained a demurrer to the first part of plaintiff's complaint, being that relating to the casting of illegal votes, and the matter was tried before the court without a jury, on the issue as to whether or not the district was authorized by law to issue bonds for the purpose of building a stadium. After taking the

matter under advisement, the court filed its findings of fact and conclusions of law, and entered judgment in favor of defendants, and plaintiff has brought the matter before us for review.

There are some seven assignments of error, but they raise only two questions of law which we need to consider. The first is as to the sustaining of the demurrer to plaintiff's allegations of illegal votes. Under the law of Arizona, persons voting at an election, where the question of issuing the bonds of a school district are concerned, must have had, on December 28, 1925, the following qualifications, as set forth in chapter 24, Session Laws of 1925:

" . . . Only such persons may vote at such election as have paid in their own name a county or state tax upon property situated within such district, other than poll, road or school tax, during the preceding year, and who are in all other respects qualified electors for the purpose of voting at regular school elections; provided, however, that whenever a husband and wife are the owners of community property, each of them, if otherwise qualified, may vote at said election without regard to whether or not the title to such community property is held in the name of the husband or the wife, by exhibiting to the election board, (a) a tax receipt showing the taxes have been paid on such community property for the preceding year, or, (b) the assessment notice of the county assessor or tax collector for the same period."

It is evident from the foregoing quotation that the demurrer was properly sustained. Plaintiff's allegation was that sixty votes were cast by persons who "were not *bona fide* taxpayers . . . and had not paid in their own name a county or state tax on property situated within said . . . district during the preceding year. . . . " These sixty voters may have lacked the qualifications which plaintiff claims they lacked and still have been entitled to vote at such election, as is evident from the statute above set forth. Since

plaintiff did not amend his complaint to meet this situation, we must presume he could not truthfully do so. Further, this is a collateral attack on the validity of a school bond election, and we have held in *Howard* v. *Luke,* 18 Ariz. 563, 164 Pac. 439, such an attack cannot be made. The demurrer was therefore properly sustained.

The second question is the vital point in the case. In substance it is: May a high school district in Arizona issue bonds to build a "stadium"? The purpose for which school bonds may be issued is governed by the provisions of paragraph 2736, Revised Statutes of Arizona of 1913, Civil Code, as amended by chapter 24, Session Laws of 1925, which reads, so far as material to this feature of the case, as follows:

"2736. The board of trustees of any school district may, whenever in their judgment it is advisable, and must, upon petition of fifteen per cent of the school electors, as shown by the poll list at the last preceding annual school election, residing in the district, call an election for the following purposes: . . .

"(3) To decide whether the bonds of the district shall be issued and sold for the purpose of raising money for purchasing or leasing school lots, *for building schoolhouses,* and supplying same with furniture and apparatus, and improving grounds, or for the purpose of liquidating any indebtedness already incurred for such purposes." (Italics ours.)

The matter then for our determination is whether a stadium is a "schoolhouse" within the provisions of paragraph 2736. The word "stadium" comes from the Greek, and was originally a measure of distance. From this, by easy transition, the term was applied first to a footrace of that distance, and then to the place where the race was run, usually an open area some six hundred feet long, and flanked by terraced elevations providing seats for the spectators

of the race. The modern definition follows the old one, but is somewhat broader in its scope and is technically given as:

"A similar modern structure with its enclosure used for *athletic games*," etc. Webster's New International Dictionary (1925 ed.).

This is also the popular definition, and we may assume, therefore, that, when the question was submitted to the electors of the district, it was understood by them that the proceeds of the bonds would be used to erect a structure where various forms of athletic games could be given by the students of the high school and spectators could be properly accommodated while watching them.

Is such a structure a "schoolhouse"? The terms "schoolhouse" and "school" are properly defined as follows:

"Schoolhouse—a building which is appropriated for the use of a school or schools, or as a place in which to give instruction."

"School—a place for instruction in any branch or branches of knowledge." Webster's New International Dictionary (1925 ed.).

Was the stadium for which the bonds of the district were to be issued a "building which is appropriated for the use of a school or schools"? It might be claimed by defendants, standing on the technical language of the definition, that any building which was used by the school was necessarily within the definition "schoolhouse"; the only limitation being that the school should use it, no matter for what purpose. We think, however, that this is too broad. Since a school is a "place for instruction in some branch of knowledge" the only legitimate "use" it can make of a building is for the purpose of giving instruction in some branch of knowledge, or something reasonably incidental thereto. Now, private

schools may give instruction on any subject, mental, moral, or physical, known to man, and which their founders or owners may desire, but the instruction given in public schools is and must necessarily be limited to subjects approved by law. No one would maintain that it was within the unfettered discretion of the pupils, the teachers, or any independent set of men or women to determine what should be taught in our public schools. Only the people, speaking through the proper authorities, can determine this question, and the law therefore provides in what branches of human knowledge instruction may be given. We therefore hold that the proper definition of a "schoolhouse" within the meaning of paragraph 2736, *supra,* is: Any building which is appropriated for a use prescribed or permitted by the law to public schools.

While the purpose of the public school and its justification for existence is always the same, like all other human institutions, it changes from time to time in the methods by which that purpose may be carried out. The first schools in most countries were generally private in their nature, particularly those whose theory of society was aristocratic. But the very nature of democracy necessarily required from the first that the embryo citizens who should in the future assume the responsibility of government must be educated. America, therefore, from the first has insisted in theory, if not always in fact, that one of the principal duties of the government was the training of its children so that they would be fitted to guide the destinies of the nation aright in the future. The founders of our first public schools believed all that was necessary, or at least then advisable, was the most elementary mental training, and therefore for many years public school education was confined principally to the teaching of the "three R's." But as the world progressed, it was recognized more

and more fully that man, using the language of the motto of one of our great philanthropic institutions, is composed of "body, mind, and spirit," and that the complete citizen must be trained in all three fields. Spiritual education from the first has been left almost entirely to the parent and the church, not because such training was considered unnecessary, but because it is to the average man so closely interwoven with dogmatic religion that, in a country whose religious beliefs are as numerous and varied as ours, it is impossible to choose a form and method of moral training in the schools satisfactory to all, or even to a considerable majority of our people.

As with the spiritual, so in the early days of our nation, it was not generally considered necessary for the public schools to attend to the physical education of the child. When eighty to ninety per cent of our population was composed of farmers, it was universally thought the growing generation found an abundance and a superabundance of physical training in the manifold duties of the home. But, with our modern industrial civilization, a great change has come over the land. At present over half our population is urban, with little or no chance for physical training for children in the home, and with the increase of human knowledge we are beginning to realize that the work of the farm and home even in the rural districts does not generally give a complete or properly rounded physical development. For this reason the new generation of educators has added to the mental education, which was all that was given by the public schools of the past, the proper training of the body, and a gymnasium is now accepted to be as properly a schoolhouse as is the chemical laboratory or the study hall. Not only is this true, but the public is realizing that, even on the mental side, the field is broadening, and, whereas fifty years ago such a thing as an auditorium with a stage was practically

unheard of in connection with the public school, now even the rural school of three or four rooms is not considered to be properly equipped without such a structure, either separate or in combination with the ordinary lecture room.

We thus see that the branches of human knowledge taught in the public schools have been vastly expanded in the last few generations. Has this expansion been sufficient to bring within its scope a structure of the class in question? It is a well-known fact, of which this court properly takes judicial notice, the large majority of the higher institutions of learning in the country are erecting stadiums differing from that proposed for the Phoenix union high school only in size, and it is commonly accepted that they are not only a proper but almost a necessary part of the modern college. This is true both of our privately endowed and our publicly maintained universities. That athletic games under proper supervision tend to the proper development of the body is a self-evident fact. It is not always realized, however, that they have a most powerful and beneficial effect upon the development of character and morale. To use the one game of football as an illustration, the boy who makes a successful football player must necessarily learn self-control under the most trying circumstances, courage, both physical and moral, in the face of strong opposition, sacrifice of individual ease for a community purpose, teamwork to the exclusion of individual glorification, and above all that ''die in the last ditch'' spirit which leads a man to do for a cause everything that is reasonably possible, and, when that is done, to achieve the impossible by sheer will-power. The same is true to a greater or lesser degree of practically every athletic sport which is exhibited in a stadium.

It seems to us that, to hold things of this kind are less fitted for the ultimate purpose of our public schools, to wit, the making of good citizens, physically, mentally and morally, than the study of algebra and Latin, is an absurdity. Competitive athletic games, therefore, from every standpoint, may properly be included in a public school curriculum. The question then is, Does the law of Arizona so include them?

The eighth legislature has specifically directed that all public school pupils not physically disabled must take, as part of the regular school work, a course in physical education, which is declared to include "athletic games and contests." So far as the instant case is concerned, this of course is merely illustrative of the present trend of thought along the lines of physical education. At the time the election referred to was held, paragraph 2733, Revised Statutes of Arizona of 1913, Civil Code, provided, among other things, as follows:

"Under such conditions as are provided for by law, boards of trustees may employ such special teachers in drawing, music, domestic science, manual training, kindergarten, commercial work, agriculture and other special subjects as they shall deem advisable."

We think "other special subjects" reasonably includes physical education, and indeed, by virtue of this provision, not only practically all high schools in the state of Arizona, but many of the grammar schools, have for years employed physical and athletic directors, both men and women, and physical education for both boys and girls is a subject required in the courses of study adopted by a large majority of our high schools, and approved by the state board of education in pursuance of paragraph 2778, Revised Statutes of Arizona of 1913; the Phoenix union high school being among this number.

If physical education be one of the special subjects

permitted by law, it is a matter for the reasonable discretion of our school authorities as to how such subject should be taught, and no parent who has ever had a child participate in any form of the athletic games and contests recognized and given by the various schools of this state, and who has noted the increased interest shown and effort put forth by the participants when such games and sports are open to the view of their schoolmates, friends and parents, both in intra and inter mural competition, but will realize the educational value both of the games and of a suitable place for giving them.

For the foregoing reasons, we are of the opinion (1) that physical education is one of the branches of knowledge legally imparted in the Phoenix union high school; (2) that competitive athletic games and sports in both intra and inter mural games are legal and laudable methods of imparting such knowledge; and (3) that a structure whose chief purpose is to provide for the better giving of such competitive athletic games and sports as aforesaid is reasonably a schoolhouse within the true spirit and meaning of paragraph 2736, *supra.*

In view of the foregoing conclusions, it is not necessary to consider the other legal questions raised by plaintiff.

The judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.