BOARD OF EDUCATION OF THE CITY OF ASBURY PARK, A MUNICIPAL CORPORATION, PLAINTIFF-APPELLANT, v. FLOYD G. HOEK, DEFENDANT-RESPONDENT, AND CARROLL C. MATTHEWS, T/A FRANK MATTHEWS COMPANY, DEFENDANT.

Argued February 5 and 6, 1962—Decided June 29, 1962.

214

216

218

*Mr. Joseph N. Dempsey,* attorney, argued the cause for plaintiff-appellant (*Mr. Donald G. Marshall,* on the brief).

*Mr. Edward W. Currie* argued the cause for defendant-respondent.

The opinion of the court was delivered by

SCHETTINO, J. Plaintiff instituted this action to recover profits on certain "cost plus" contracts, awarded without public bidding, for work performed in Asbury Park schools from September 25, 1952 through September 25, 1958. Defendant Hoek was plaintiff's secretary-business manager during the period in question and defendant Matthews is a carpenter-contractor who performed work under the contracts.

The pretrial order did not serve to crystallize the issues. With the aid of the complaint, however, it seems clear that

plaintiff sought recovery from defendant Hoek on four theories: first, that Hoek had breached his statutory duties by concealing from plaintiff the fact that defendant Matthews was overcharging on his cost plus contracts; second, that Hoek conspired with Matthews to defraud plaintiff by overcharging profits and to conceal such overcharges; third, that in violation of his statutory duties and with intent to avoid the bidding statute pertaining to contracts for repairs over $1,000, Hoek divided large projects into smaller components and concealed that fact from plaintiff so as to make it appear that contracts for repairs and enlargement costing less than $1,000 per job were involved; and fourth, that Hoek conspired with Matthews to avoid the bidding statutes by so dividing and splitting large repair contracts.

In respect to damages plaintiff alleges that Hoek is liable for all profit payments illegally disbursed in excess of 10% of cost on all contracts. (These payments will hereafter be referred to as "profit overcharges.") With respect to the allegedly "split" contracts, plaintiff seeks to recover all profits realized thereon on the theory that such contracts were illegal.

During the course of the trial, Matthews entered into a settlement with plaintiff for $1,750 in return for a covenant not to sue. Thereafter, the case was prosecuted against Hoek alone and culminated in a verdict for plaintiff in the sum of $10,292.98, less $1,750, the amount of Matthews' settlement. After judgment was entered conforming thereto, the trial court denied Hoek's motion for a new trial. It then modified the judgment to read $10,292.98, marked satisfied as to 50% representing Matthews' proportionate share. On Hoek's appeal, the Appellate Division reversed and directed entry of judgment for Hoek. 66 *N. J. Super.* 231 (1961). We granted plaintiff's petition for certification. Its contention is that the trial court's judgment should be reinstated or at least the case should be remanded for a new trial on all issues. Hoek, of course, urges affirmance

of the Appellate Division. This posture makes necessary our consideration of all the questions passed upon by the Appellate Division as well as other aspects of the many issues involved.

The occasion of Hoek's initial dealings with Matthews took place in 1948. In the course of his ordinary duties as business manager, Hoek examined the physical condition of the High School and discovered that a number of window sills were rotting. His attempts to remedy this condition came to the attention of plaintiff's then president, Louis Farmer. Farmer, a professional architect, indicated that a carpenter should be engaged to properly replace the sills and recommended Matthews to this end. Thereafter and throughout the years in question, Matthews' dealings with plaintiff were almost exclusively through Hoek. The parties agree that Matthews' work proved satisfactory and that whenever the need arose for a skilled carpenter, he was called. No one else was ever contacted, according to Farmer, because that "would be a poor way to show a man how much we appreciated what he did do."

From 1948 to 1950 Matthews submitted vouchers for his work, describing in general the particular project completed and listing the total amount charged. After Board members discussed this practice in the summer of 1950, plaintiff directed Hoek to require a complete breakdown of charges on all contracts and to negotiate contracts with Matthews on a cost plus 10% profit basis. Hoek conveyed this information to Matthews and the latter originally conformed to the practice, including on each voucher, on a line designated "Profit and Overhead," the figure "10%" and a dollar figure which equalled 10% of cost. In February 1951 Matthews submitted a group of vouchers properly conforming to the directed practice but containing one voucher which did not list any profit percentage figure. The profit actually charged and listed on the voucher amounted to 15% of cost. Although Matthews resumed the directed practice for a while after this incident, he discontinued

listing the percentage figure in 1952. From August 1952 on, with isolated exceptions, the actual profit charge amounted to 20% of his cost.

There is conflicting testimony as to whether plaintiff was apprised of the increased profit charges. Hoek said that he may have spoken with Matthews about the increased profit charge and that Matthews possibly said, "Look, I feel I have to make a bit more money, and I will still be within the price." But there was no doubt in Hoek's mind that he brought to plaintiff's attention at a Board meeting both that Matthews was no longer listing the profit percentage figure and also that the profit charge was increased above 10% of cost. According to him, Farmer commented that the increase was perfectly agreeable in view of the increasing prices, and no other Board member objected. On the other hand, two members of the Board testified that plaintiff had never been informed about the change in procedure and amount of profit charge. No entry appears in the minutes of the Board meetings recording such a change in procedure although Hoek was the secretary.

Matthews' vouchers were submitted and intermingled with vouchers of other contractors, and certain Board members spent a portion of each meeting reviewing all vouchers. Hoek and Farmer said this procedure consumed as much as a half hour of each meeting and that the vouchers were examined in detail as to their breakdown. In contrast, the Board members who actually did the examining said they had little opportunity to do more than leaf through each group of vouchers.

There is no dispute that on top of each group of vouchers submitted to plaintiff for approval was a certification by Hoek that he had examined the vouchers and found them to be true and correct. Until 1952 or 1953 Hoek would submit all of the vouchers to the finance committee composed of three Board members. But thereafter they were submitted for approval only to the entire Board.

222

As specified by statute, the duties required of defendant, as plaintiff's secretary and business manager, are as follows:

"The secretary shall be the general accountant of the board and shall preserve in his office all accounts, vouchers, and contracts relating to the public schools. He shall examine and audit all accounts and demands against the board. Every such account or demand, except for salaries, exceeding $5.00 shall be verified by affidavit or contained or have annexed thereto a signed declaration in writing to the effect that such account or demand is correct in all its particulars, that the articles have been furnished or services rendered as stated therein and that no bonus has been given or received on account thereof." *N. J. S. A.* 18:6–34.

"All plans and specifications for the erection, improvement, or repair of public schoolhouses shall be drawn by or under the supervision of the business manager, if there is one, and shall be approved by the board.

The business manager, if there is one, shall supervise the construction and repair of all school buildings, and shall report monthly to the board the progress of the work. Repairs not exceeding the sum of one hundred dollars may be ordered by the business manager, and repairs not exceeding the sum of five hundred dollars may be ordered by the committee of the board having charge of the repair of school property, without the previous order of the board and without advertisement.

The business manager, if there is one, shall superintend all advertisements for bids and the letting of all contracts.

He shall inspect all work done and materials or supplies furnished under contract, and, subject to the approval of the board, shall condemn any work and reject any material or supplies which, in his judgment, do not conform to the specifications of the contract therefor, and shall perform such other duties as may be required by the board." *R. S.* 18:6–47.

The bidding statute, as originally enacted, read as follows:

"The board shall, prior to the beginning of each school year, cause advertisement to be made for proposals for furnishing supplies required in the schools and by the board during the ensuing year. If other and further supplies are required during the year, they shall be purchased in like manner; but the board may at any time authorize the purchase of supplies to an amount not exceeding two hundred and fifty dollars without advertisement.

Textbooks and kindergarten supplies may be purchased without advertisement.

No contract for the building of a new schoolhouse or for the enlargement of an existing schoolhouse shall be entered into without

first advertising for proposals therefor. No contract for the repairing of an existing schoolhouse at a cost of more than five hundred dollars shall be entered into without first advertising for proposals therefor.

The advertisements required by this section shall be made under such regulations as the board may prescribe."

In 1949 the section was amended to increase the minimum amount as to supplies to $500 and as to repairs to $1,000. *L.* 1949, *c.* 150, *p.* 533. The amounts were further raised by *L.* 1957, *c.* 174, *p.* 615, effective August 8 of that year, to $1,000 for supplies and $2,000 for repairs.

Based upon these facts plaintiff asserted that Hoek was liable for profit overcharges. Subsequent factual emphasis is directed primarily to the contention that Hoek and Matthews conspired to avoid the bidding statute by splitting large contracts to make them appear as jobs costing less than $1,000, and thereby to defraud plaintiff. Each year Hoek, usually in company with Farmer, would review plans, inspect the buildings in the school system and prepare reports estimating the nature and extent of maintenance work which would be required for the next fiscal year. The reports would then be submitted to plaintiff for use as a basis for budget planning. Some of the projects in issue were expressly included in these reports but many were not. The school district budget figures for maintenance ran into sums in excess of $50,000 per fiscal year, except for 1952–1953 when the figure was approximately $34,000. When contrasted with total expenditures for that purpose and expenditures made for carpentry work, these figures are significant. For example, in the fiscal year 1956–1957, $97,922 was estimated in the budget for total repairs and replacements. Cash expenditures actually totaled $133,158.09. And during the same period, the cost of work performed by Matthews alone was $24,945.89. Yet none of the latter work was advertised. One of the reasons for this, according to Hoek, was because such work could not be anticipated.

As long as the statute required public bidding for repairs in excess of $500, none of the vouchers submitted by Matthews was for an amount in excess of that sum. After the statutory maximum was increased to $1,000, Matthews sometimes submitted vouchers for sums in excess of $500 but never for more than $1,000. Certain members of the Board from time to time questioned the vouchers submitted by Matthews, but there is testimony to the effect that Hoek would assure them that no bidding was necessary either because the work was of an emergency nature and could not be anticipated or the vouchers pertained to separate jobs costing less than $1,000 per job. Hoek testified to the effect that Farmer justified the non-bidding on the grounds that the work was of a specialized kind not requiring bidding.

Plaintiff introduced into evidence all or substantially all of the vouchers submitted by Matthews during the period in issue. Those vouchers which were asserted to represent large contracts which had been split into small dollar amounts so as to avoid the statutory requirement were collected according to the large contract they allegedly represented and introduced as Exhibits P–28, P–32 through P–48 and P–51. The remaining vouchers were collected according to the fiscal years in which they were submitted and introduced as Exhibits P–7, P–8, P–10, P–12, and P–13 to prove alleged profit overcharges with respect to them.

Plaintiff contends that the large contracts are evident primarily from an examination of the vouchers comprising Exhibits P–28, P–32 through P–48 and P–51. A short description of a few of these exhibits is instructive. Thus, Exhibit P–28 included six vouchers dated April 20, April 23, May 3, May 18, May 29 and June 11, 1953 totaling over $1,500. These represented work performed in the construction of a storage garage under the football stadium for a school bus and other equipment. Exhibit P–32 is made up of seven vouchers representing work allegedly performed

on consecutive days in the construction of closets and shelves in various places in the Bradley School. The vouchers are dated December 31, 1952, January 8, January 11, January 16, January 22, January 30 and February 2, 1953, and totalled over $2,000. Exhibit P–33 consisted of three contracts which were for the removal of old and the installation of new maple floors in certain classrooms in the High School. They were dated June 22, June 26, and June 30, 1953 respectively and totaled over $1,000. And Exhibit P–34 represented work performed in making certain changes in the High School library at a cost for carpentry of more than $2,500.

The bulk of the library work was performed during the months of July and August of 1953 and had been recommended one year before in an evaluation report made by the Middle States Association of Secondary Schools and Colleges. Nevertheless, Farmer, testifying for Hoek, indicated that the project only became crystallized as work progressed and that a workroom in the library had been decided upon only when the librarian made a request therefor after the library project was "pretty near completion." In contrast, the librarian subsequently testified that she had been out of the State at all times while the library work was in progress and that in fact the Middle States Association report had recommended the workroom.

Most of the other exhibits·involved carpentry work such as constructing closets, shelving, doors, bulletin boards, walls, windows and trophy cases. Not all of them presented a pattern as clear as those set forth above, however. Hoek contends that they constitute such an unrelated mixture of jobs (one voucher represented in part the construction of a playhouse in the kindergarten; another involved the repair of a seesaw), that they are obviously not part of any one project. Furthermore, he would have us declare that the work provided "equipment" rather than "repairs," for, in his view, the purchase of equipment does not require conformance with the requirements of the bidding statute.

## I.

 We will first consider the matter of the charge to the jury as to which the Appellate Division found reversible error. At the close of Hoek's case, the trial court read to the jury the statutes regarding bidding and Hoek's statutory duties. It then explained the law applicable to conspiracy in general terms and outlined the reasoning process for the jury, indicating that as a first step they must determine whether the contracts were legal or illegal. No distinction was drawn between the legal status of allegedly split contracts and the other contracts. Attention was then directed to the necessity of determining whether large contracts had been split and whether Hoek was remiss in his statutory obligation in this regard. At this point the court requested an answer to an interrogatory in the following terms:

"The Court directs you that you announce on the return of your verdict, if you should determine the contracts are illegal, whether it is by reason of the conspiracy between Hoek and Matthews, or as the result of Hoek's violation of his statutory duties."

Only after delivering this direction, however, did the court mention plaintiff's claim for profit overcharges on the ground that Hoek had failed to perform his statutory duties. The court stated:

"Plaintiff on its claim for overcharges on the contracts has indicated by vouchers in the folders by fiscal years, would only be entitled to the amount of profit found by you to be charged over ten per cent on these vouchers. You would not consider the vouchers in the groups of P–28 to P–51, if you have already awarded damages on the conspiracy theory.

With regard to the claim of improper charges under the illegal contracts, if you so find, and if you find that payments resulted in overcharges, and you further find that the plaintiff directed the defendant Hoek to have Matthews charge his actual cost plus ten percent, and that Hoek so informed Matthews, any charges over and above this formula would be excessive, and here again, should these excesses be determined by you to be the result of Hoek's

improper examination of the vouchers and failure to properly notify
the Board that they were in excess of the agreed amount, the plain-
tiff would be entitled to a return of all profits received by Matthews
which exceeded the agreed cost plus ten percent."

The Appellate Division's analysis of the above portion of
the charge and the subsequent verdict is as follows (66
*N. J. Super.*, at *pp.* 239–240) :

"We note particularly that in the instructions just quoted 'con-
spiracy' is never once mentioned in connection with overcharges.
Indeed, the implication left with the jury was that no conspiracy
existed in this respect, since the trial judge spoke of the 'conspiracy
theory' in referring to Exhibits P–28 to P–51, which dealt with
split contracts only.

In the light of this part of the charge, could any jury be sure
whether the court had instructed it as to plaintiff's claim of a
conspiracy to overcharge? We think not, and we find no other
instruction which exposed such a claim to the jury in clear and
unmistakable terms. If anything may reasonably be said, it is this—
that the jury could possibly have been led to believe that contracts
which had nothing more wrong with them than a profit item exceed-
ing 10% of actual cost were *illegal*. This, of course, is not so.

Nor was the jury helped when the court repeated its charge as
to a special verdict. The jury had retired while counsel made their
exceptions to the charge as given and failure to charge as requested.
When the jury returned, the trial judge said :

'While I have you here, one further instruction, may I direct your
attention that under the Charge as the Court gave it to you it
requires that you return a special verdict as to the contracts, as to
whether or not they are legal or illegal and I think the Court stated
to you the basis upon which you should state whether or not it is
the result of conspiracy or as the result of the failure of the statutory
duty: I don't want you to forget that or overlook it.'

The jury retired—presumably with an adding machine which
they had requested—and returned in 55 minutes. The trial judge
then asked the forelady :

'May I ask you to state your determination as to the legality or
illegality of the contracts?'

She replied :

'We find the contracts to be illegal on the grounds of conspiracy.'
The verdict returned was $10,292.98 less $1,750, or $8,542.98.

It is difficult to determine just how the jury arrived at its
$10,292.98 figure. The total amount of profits on the allegedly
illegal (split) contracts (Exhibits P–28 to P–51) was $7,801.53, at
a maximum. A possible explanation—although this is speculative—
is that the jury awarded damages in the amount of all the profits on

those contracts and then added some of the profits which exceeded 10% of actual cost. We find the verdict excessive under any theory of the case. Its amount coincides with none of the theories plaintiff advanced, nor can it be derived from any perceivable combination of figures. The verdict evidences the state of confusion in which the jury must have found itself."

We concur in this part of the Appellate Division's opinion, although it should be pointed out that the "special verdict" referred to would more properly be designated as an answer to an interrogatory accompanying a general verdict. Compare *R. R.* 4:50–1 with *R. R.* 4:50–2. Sufficiency of a charge in the respect here relevant should be measured by determining whether or not jurors, in light of all the facts, would misunderstand or be confused. *Ristan v. Frantzen,* 14 *N. J.* 455, 461 (1954); *Kargman v. Carlo,* 85 *N. J. L.* 632 (*E. & A.* 1914). Both the charge (*Kauderer v. McAllister Coal Co.,* 132 *N. J. L.* 410 (*E. & A.* 1945)) and the verdict (in particulars discussed below) here contribute to the conclusion that the jury was confused. But the conclusion requires a new trial on all issues rather than a judgment for Hoek as directed by the Appellate Division.

## II.

■ Hoek reasons persuasively and the Appellate Division found that the verdict was excessive. This issue must be resolved in light of the whole record. In personal injury cases where damages can be gauged by no fixed standards, our appellate courts will interfere with the verdict on the ground of excessive damages only in a clear case. *Salvato v. N. J. Asphalt & Paving Co.,* 135 *N. J. L.* 185, 189 (*E. & A.* 1947). See also *Andryishyn v. Ballinger,* 61 *N. J. Super.* 386, 393–394 (*App. Div.* 1960); *Cabakov v. Thatcher,* 37 *N. J. Super.* 249, 257–258 (*App. Div.* 1955). *Cf. Lorenc v. Chemirad Corp.,* 37 *N. J.* 56, 81 (1962). In contrast, where the verdict exceeds an undisputed amount, *e. g.,* the maximum amount of profit which plaintiff might recover under any of the theories presented,

an appellate court may vacate a judgment on the ground that the verdict exceeds that amount. 6 *Moore, Federal Practice* ¶ 59.08[6], *p.* 3829 (1953).

In answer to the interrogatory, the jury indicated that it found the contracts "illegal on the grounds of conspiracy." When read in light of all the facts, with particular reference here to the delivery of the charge, we think this could only refer to the alleged conspiracy to avoid the bidding statute requirements; for the verdict must be understood as an effort to conform to the charge. *Dewar v. Ruehle,* 137 *N. J. L.* 304 (*Sup. Ct.* 1948). When the case is so viewed, the verdict of $10,292.98 does not conform to the damages which are mathematically computable under the theories of liability presented.

The maximum amount of damages requested by plaintiff on the theory that contracts were split was $7,698.57. Our own computations indicate that the total profit charges on the allegedly split contracts may be slightly below this figure. It is evident, therefore, that damages must have been awarded on another theory as well. In the view that we take of the case and the way the charge was presented to the jury, the remaining theory on which damages may have been awarded is that Hoek was liable for profit over-charges.

The portion of the charge above quoted properly sets forth the instruction that in considering damages on the theory of profit overcharges, the jury should not consider the vouchers introduced to prove split contracts if damages were awarded as to such vouchers on a theory that the bidding statute had been illegally circumvented by Hoek. Profit charges in excess of 10% on all the vouchers submitted during the years in question allegedly totaled $6,321.11. Excluding alleged profit overcharges on those vouchers used to prove split contracts (*i. e.,* Exhibits P-28, P-32 through P-48 and P-51), alleged profit overcharges on all other vouchers which plaintiff urges should properly be considered (*i. e.,* Exhibits P-7, P-8, P-10, P-12 and

P–13) total "approximately $2,600" according to plaintiff.
 ▮ Were we to assume that plaintiff's calculations are accurate, the verdict is reasonably close to the total which plaintiff advances. However, we are unable to determine how plaintiff arrived at the figure of "approximately $2,600." At best, the overcharges on the indicated vouchers appear to be considerably less than that amount. We agree with the Appellate Division's conclusion that the damages are excessive, but this at most would call for a new trial.

## III.

A certain amount of confusion exists regarding the scope of the bidding statute. Little case law exists on the subject in New Jersey. The Commissioner of Education had occasion to interpret the statute in 1951 and decided that a board of education could purchase furniture in the nature of desks and chairs without the necessity of preliminary public bidding. *Fochi v. Board of Education, Borough of Lodi* [1951–1952], *School Law Decisions* 37. In answer to a letter from Hoek concerning the purchase of kitchen appliances, the Assistant Commissioner of Education offered the further opinion, by letter dated May 22, 1956, that "equipment" does not fall within the purview of the bidding statute.

The bidding statute on its face requires that "supplies" in excess of a stated amount and contracts involving more than a specific figure for "repairing" an existing schoolhouse must be opened to public bidding. Contracts for the building and enlargement of a schoolhouse are also subject to public bidding requirements. Thus, we are squarely faced with the determination whether the work performed by Matthews falls within one of these categories.

The Appellate Division held, as a matter of law, that no identifiable part of the work came within the quoted categories of the bidding statute and that therefore the charge of conspiracy to split contracts must fall. Since it

found that the jury awarded damages only on the basis of conspiracy to violate the bidding statute and not on any theory of individual liability with respect to profit over-charges, it directed the entry of judgment for Hoek. We think it erred in holding that the work was not within the statute. While a reversal of the trial court judgment was required for other reasons, such reasons called for a new trial and did not permit reinstatement of the original verdict or entry of judgment in favor of Hoek.

### A.

Hoek urges that none or an insignificant amount of the projects involved constituted "repairing." He would read the word as it has been frequently defined in diction-aries, *i. e.,* to restore to a sound or good state after decay, injury, and like conditions. There can be no doubt that many authorities would so interpret the word. See 36A *Words & Phrases, Repair, pp.* 749, 754, 766–767 (1962); 76 *C. J. S. Repair* 1169–1170 (1952). *Cf. R. S.* 1:1-1, *N. J. S. A.* But statutes should not be construed without regard for the manifest intent of the Legislature. The legislative goal serves as a guiding consideration, *Bechler v. Parsekian,* 36 *N. J.* 242 (1961), and accordingly words in a statute must be interpreted in context to serve the spirit of the law. *Walnut Realty Co. v. Director of Div. of Taxation,* 36 *N. J.* 365, 375 (1962).

Patently the purpose of the bidding statute is one of protecting the public interest by keeping costs at a minimum and preventing fraud. With these purposes as paramount considerations, it is difficult to conceive that the Legislature intended to require bidding for the erection of school buildings and also for repairs that are effected to counter decay while at the same time sanctioning the ex-penditure of large sums for repairs in the nature of im-provements or alterations without requiring public bidding. It is true, as Hoek points out, that in defining the duties

of a business manager, the Legislature declared that he should supervise the drawing of plans and specifications for the "erection, improvement, or repair" of public school-houses. *R. S.* 18:6–47. While the use of the word "improvement" in this section cannot be ignored, it should not control the interpretation of *N. J. S. A.* 18:6–25. Delegation of responsibilities in the section dealing with the duties of a business manager includes both duties which are directly related to bidding statute requirements and others, *e. g.,* supervision of the drawing of plans and specifications. Clearly the scope of *N. J. S. A.* 18:6–25 cannot be effectively gleaned from the statute as a whole merely by noting the use of more detailed terminology in only one of the sections. We note that *N. J. S. A.* 18:11–10, the separate bidding provision, provides:

"In the erection, construction, *alteration* or repair of a public school building, when the entire cost of the work will exceed two thousand dollars ($2,000.00) in amount, the board of education shall, in the manner provided by law, advertise for and receive *separate* bids for the plumbing and gas fitting, and all work kindred thereto, the steam and hot water heating and ventilating apparatus, steam power plants and all work kindred thereto, and electrical work, structural steel and ornamental iron work." (Emphasis added)

Although the predecessor to this section was added to the statute 12 years after the enactment of the basic act, it appears to reflect the Legislature's belief that contracts for the alteration of a school building are subject to bidding requirements. We think there is an implication that alteration contracts were intended to be subject to public bidding also.

 Increased enrollment, passage of time, wear, decay and technological advancements, all contribute to diminishing the usefulness and efficient operating condition of a school building and its parts. When a building or any of its parts becomes outmoded or requires renovation work to maintain it in a condition of prime usefulness for its designated purpose, any work necessary to that end which

falls short of enlarging the building's cubic capacity is properly termed repair work. In this sense the word is synonymous with renew, revivify or remedy. See *Webster's New International Dictionary* (*3d ed.* 1961).

If, in the judgment of the Commissioner (*R. S.* 18:11–12) or some certifying agency, changes in a school building are required, as a practical matter, the changes must be made. Whatever the practical cause motivating the required work, the building must be repaired to a state of present usefulness and premium condition. In our opinion, it is in this sense that the word "repairing" is used in *N. J. S. A.* 18:6–25. Only when so read is the public interest protected.

We are neither cited to nor are we able to find any case interpreting the word "repairing" in a statute of another state which is worded substantially the same as *N. J. S. A.* 18:6–25. Where the school statute concerned expressly mentions repairs and improvements or alterations in the bidding section, the word has been interpreted as Hoek suggests it should be. See cases collected in 36A *Words & Phrases, Repairs, supra.* And a similar result has been reached where the statute involved required approval of the voters to expend public funds except in the instance of certain enumerated purposes. *Ibid.* However, in the first situation it is obvious that a distinction between "repairs" and "improvements" or "alterations" was dictated by the statutory wording itself. And in the second situation, the statutory purpose of protecting the public interest was furthered by such a distinction. In the same context those considerations do not compel a similar result here.

Even so, at least one case interprets "repairs" broadly even in the face of an attack on the power of a board. In *Ellingson v. Cherry Lake School Dist.,* 55 N. D. 141, 212 N. W. 773, 775 (*Sup. Ct.* 1927), a taxpayer questioned the power of a school board to remodel and improve a schoolhouse. The statute in issue provided authority to make "repairs" to schoolhouses. Although the schoolhouse had been maintained in generally good condition, it was apparently

little more than a shell building. The court held that providing a basement, a well, a furnace to replace a stove, plasterboard walls and indoor plumbing constituted "repairs" within the meaning of the statute. More analogous to the instant case is *State v. Parish,* 180 *Ind.* 63, 99 *N. E.* 977 (*Sup. Ct.* 1912), wherein the duty of trustees to make repairs and to prepare plans or specifications therefor was questioned. The record indicated that, after an inspection by a trustee, the trustee determined that the school heating and ventilating system was inadequate for sanitary purposes. A statute made it the duty of trustees to provide and keep schoolhouses in "repair" and in a healthful and sanitary condition. The court characterized the installing of a proper heating and ventilating system as "repairs" and declared that it was the duty of school authorities to provide plans and specifications for such work. Compare *Scola v. Board of Education,* 77 *N. J. L.* 73, 77 (*Sup. Ct.* 1908). For cases characterizing as "repairs" work similar to that here involved, without reference to a statutory term, see *School Dist. No. 6, Chase County v. Robb,* 150 *Kan.* 402, 93 *P. 2d* 905–908, 124 *A. L. R.* 879 (*Sup. Ct.* 1939), and *Board of Com'rs of Guadalupe County v. State,* 43 *N. M.* 409, 94 *P. 2d* 515, 518 (*Sup. Ct.* 1939).

The jury was not asked to decide whether Hoek acted in good faith upon the interpretation of "repairs" which he advances. In view of the fact that the statutory term "repairing" has not heretofore been interpreted by this court and in view of the lack of authorities precisely in point, Hoek should be permitted to present evidence relevant to this issue upon retrial of the case. If the jury finds that he acted in the good faith belief that "repairing" did not encompass the work here involved, he should not be held accountable under these circumstances.

## B.

In support of his contention that much of the work performed in reality constituted nothing more than the pur-

chase of equipment, Hoek cites the letter from the Assistant Commissioner of Education indicating that in the opinion of the Commissioner, equipment such as kitchen appliances is not within the meaning of "supplies" in *N. J. S. A.* 18:6–25. Assuming that Hoek relied upon this opinion, we are unable to see a sufficient comparison for this purpose between kitchen appliances and any item constructed by Matthews subsequent to May 11, 1956, the date of the ruling. Compare *Edkins v. Board of Education,* 261 *App. Div.* 1096, 26 *N. Y. S. 2d* 996, 997 (*App. Div.* 1941) (mem. decision). But see *Midland Special School Dist. v. Central Trust Co.,* 1 *F. 2d* 124, 126 (8 *Cir.* 1924); and *Polliak v. Smith,* 19 *N. J. Super.* 365, 369 (*Ch. Div.* 1952). Furthermore, although we are not now directly faced with the question, it should be noted that *N. J. S. A.* 18:6–25 requires that the purchase of supplies costing more than $1,000 must conform to the public bidding requirements. And with due regard to the Commissioner's letter opinion, it nevertheless is by no means settled that the word "supplies" does not encompass furniture and equipment. See *Commonwealth v. Zang,* 142 *Pa. Super.* 573, 16 *A. 2d* 745, 748 (*Super. Ct.* 1941).

 Moreover, the statute itself is worded in such a manner to indicate that "supplies" may well have been intended to be all-inclusive. Compare *N. J. S. A.* 18:6–25, *supra,* with *N. J. S. A.* 18:11–14, which states in part: "The board of education may purchase food supplies * * * [for school cafeterias] without advertisement for bids."

 On August 8, 1955 the Governor vetoed a proposed amendment to *N. J. S. A.* 18:7–64 (which is similarly worded to *N. J. S. A.* 18:6–25) because he noted "some confusion" as to the meaning of "supplies" as used in that section. To eliminate any confusion in the minds of school board members he recommended that the section be also amended to expressly require public bidding in the purchase of "materials, desks, furniture or other" supplies. *Veto Messages of Hon. Robert B. Meyner, Governor of New*

*Jersey, p.* 17 (1955). The provision was later amended without so changing it. *L.* 1957, *c.* 174, § 2. We need not speculate upon the effect of the Legislature's failure to include the Governor's suggestions in the 1957 law. Perhaps a different result would be required were such suggestions made in the form of an interpretation of the statute or suggested change in the statutory coverage. *Cf. Lynch v. State,* 19 *Wash.* 2d 802, 145 *P.* 2d 265, 269 *(Sup. Ct.* 1944); *Shelton Hotel Co. v. Bates,* 4 *Wash.* 2d 498, 104 *P.* 2d 478, 481 *(Sup. Ct.* 1940). But here the Governor merely recognized that a certain amount of confusion existed with regard to the statutory meaning. Refusal by the Legislature to adopt the suggested wording under these circumstances is of little, if any, significance to the matter at hand.

## C.

██ Even though we hold that "repairing" includes much if not all of the work performed on the Asbury Park schools, Hoek contends that the work performed on the stadium does not come within the meaning of "repairing" or "enlarging" a "schoolhouse." Both he and the Appellate Division point out that other sections of the act refer to "public school property," *R. S.* 18:6–18 and *R. S.* 18:6–19; and "property for school purposes," *N. J. S. A.* 18:6–24. However, those sections relate to the broad powers of a board. Necessarily, they are worded to include power over things not referred to in the bidding section, *N. J. S. A.* 18:6–25, such as property other than buildings. They should not, therefore, be interpreted to restrict the meaning of "schoolhouse" as urged by Hoek.

The term "school building" in education laws of other states has been interpreted to include a stadium, *Nicholas v. Calhoun,* 204 *Miss.* 291, 37 *So.* 2d 313, 314 *(Sup. Ct.* 1948); *contra, Board of Education of Louisville v. Williams,* 256 *S. W.* 2d 29, 30 *(Ky. Ct. App.* 1953). It has also

been interpreted to include a gymnasium, *Ranier v. Board of Education of Prestonsburg Ind. Sch. Dist.,* 273 *S. W. 2d* 577, 581 *(Ky. Ct. App.* 1954) ; *Jones v. Sharyland Independent School Dist.,* 239 *S. W. 2d* 216, 218 *(Tex. Civ. App.* 1951) ; *Gibson v. State Board of Education,* 201 *Ark.* 1165, 148 *S. W. 2d* 329, 330 *(Sup. Ct.* 1941) ; *In re Savannah Special Consol. School Dist.,* 208 *Miss.* 460, 44 *So. 2d* 545, 547 *(Sup. Ct.* 1950) ; *cf. Woodson v. School Dist. No. 28,* 127 *Kan.* 651, 274 *P.* 728, 730 *(Sup. Ct.* 1929). When viewed in the light of the purpose of the education laws and the reason for supplying school buildings, the term "school building" might well be equated with "schoolhouse" as that term is used in *N. J. S. A.* 18:6-25.

In *Alexander v. Phillips,* 31 *Ariz.* 503, 254 *P.* 1056, 52 *A. L. R.* 244 *(Sup. Ct.* 1927) the court was faced with the question whether a statute authorizing a board of education to issue bonds "for building schoolhouses" was intended to authorize issuance of bonds to finance the construction of a stadium. The court declared that the education act permitted the teaching of physical education and a stadium was reasonably connected with the purpose of providing facilities for physical education training. It reasoned that competitive athletic games are no less fitted for furthering the ultimate purpose of public schools, *i. e.,* the making of good citizens, physically, mentally and morally, than the study of other subjects. For this reason the court held that "schoolhouse" meant any building which is appropriated for a use prescribed or permitted by law to public schools. See also 47 *Am. Jur., Schools,* § 5 (1943).

The rationale of the *Alexander* case is equally applicable here. Under our education laws, the conducting of courses in physical education is a mandatory requirement for each local board of education. *N. J. S. A.* 18:14-93. That the construction, enlargement or repair of a stadium is reasonably related to the furtherance of some types of physical training cannot be disputed. And the formation and plan-

ning of the prescribed courses in physical training is, subject to the general supervision and direction of the Commissioner (*R. S.* 18:14–95), left to the discretion of each local board.

· Portions of the work performed upon the stadium were intended to accommodate school busses and other equipment. But it has been held that building a fence, furnishing a drinking-water supply and building a central heating plant separated from other buildings are all within the meaning of building a schoolhouse. See *Chamberlain v. Cranbury,* 58 *N. J. L.* 347, at *p.* 353 (*E. & A.* 1895); and *Scola v. Board of Education, supra.* A garage for transportation and maintenance facilities is equally as related to the building, enlargement or repair of a schoolhouse.

## IV.

We next consider whether there was sufficient evidence in the record to support a verdict of conspiracy. The Appellate Division held that there was not.

### A.

 The gravamen of an action in civil conspiracy is not the conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action. *Middlesex Concrete Products and Excavating Corp. v. The Carteret Industrial Ass'n,* 37 *N. J.* 507; *Kurtz v. Oremland,* 33 *N. J. Super.* 443 (*Ch. Div.* 1954), affirmed on opinion below, 16 *N. J.* 454 (1954); *Earl v. Winne,* 14 *N. J.* 119 (1953); *Louis Kamm, Inc. v. Flink,* 113 *N. J. L.* 582 (*E. & A.* 1934). Proof of a conspiracy makes the conspirators jointly liable for the wrong and resulting damages. Here there was clearly sufficient evidence to support a verdict that a wrong had been done. Conflicts in the evidence were for the jury to resolve in the performance of its duty as the fact finder.

 Admittedly there was no direct evidence in the

record of an actual agreement between Hoek and Matthews to avoid the bidding statute. But it is well known that the nature of a conspiracy is such that more often than not the only type of evidence available to prove the conspiracy is circumstantial evidence. And although the verdict must not be the result of pure speculation (*Sokolay v. Edlin,* 65 *N. J. Super.* 112, 130 (*App. Div.* 1961)), circumstantial evidence will suffice. *Louis Kamm, Inc., supra; Fife v. Great Atlantic & Pacific Tea Co.,* 356 *Pa.* 265, 52 *A.* 2*d* 24, 27 (*Sup. Ct.* 1947).

In *Louis Kamm, Inc., supra,* a broker told the name of his client to the president of the prospective seller, but only after he had received an assurance that the president would keep the disclosure in strictest confidence. It later developed that the president's brother, also a broker, obtained the prospective buyer as his own client and negotiated the purchase from the seller. In doing so the brother used the name of a broker who had the use of his office rather than using his own name. The court held that the facts gave rise to an inference of sharp dealing and this coupled with the relationship of the defendants was sufficient circumstantial evidence to give rise to a legitimate inference of conspiracy.

The facts in the instant case give rise to an inference equally as strong as that in *Louis Kamm, Inc., supra.* The work on the projects was of a very similar nature and was performed on consecutive days. Moreover, Hoek frequently spoke with Matthews during the course of the years in issue. From these facts, when coupled with the great volume of work performed and the pattern evidenced by the vouchers, a jury might reasonably infer that Hoek and Matthews conspired together to deceive plaintiff and to avoid the bidding statute.

We should add that there was sufficient evidence from which the jury could also infer a conspiracy with respect to profit overcharges.

240

## B.

A contention similar to Hoek's ' assertion that he could not anticipate the separate aspect of the work involved here was made in *In re Audit of School Dist. of City of Scranton*, 354 *Pa.* 225, 47 *A. 2d* 288, 290 (*Sup. Ct.* 1946). There a board of education purchased an athletic field and proceeded to use board employees to drain and grade the field and repair the grandstand, dressing rooms, shower rooms, and the ticket office. The court held that it must have been apparent to the board that the work was related to a general plan of construction and therefore within the scope of the bidding statute requirements. While we need not reach a similar conclusion here, a comparison of the facts lends support to plaintiff's assertion that there was sufficient evidence to support a verdict in this regard.

## C.

Nor can it be said, as Hoek urges, that the "emergency" nature of the projects did not permit time to conform to the statutory requirements. Projects which display so imminent a need that normal procedures may be dispensed with must be of such sudden or unexpected occurrence or exhibit a new condition calling for immediate action. *Frank v. Board of Education of Jersey City*, 90 *N. J. L.* 273, 275 (*E. & A.* 1917). There is substantial evidence in the record from which a jury could infer that no such emergency existed. Compare *Saunders v. Board of Education*, 59 *N. E.* 2d 936 (*Ohio Ct. App.* 1944) with *Commonwealth v. Zang, supra*. Many of the projects involved were instituted only after school recessed for summer vacation. Farmer and Hoek admittedly made inspections of the buildings and grounds periodically. And in the case of the library renovation a full year passed between notice of the need and initiation of the project.

## V.

Hoek also contends that plaintiff is now estopped to assert a claim against him for profit overcharges received by Matthews. In support of his argument, Hoek points out that he always submitted all vouchers for plaintiff's approval. Moreover, until sometime in the latter part of 1952 or early 1953 he would also submit the vouchers for review by the finance committee. He emphasizes his own testimony indicating he apprised plaintiff of Matthews' increase in profit charge and the testimony of Novogrod that Board members sometimes questioned the vouchers in light of bidding requirements.

The crux of Hoek's contention appears to be that plaintiff is "estopped" here in the broad sense of ratification by approval. Although ratification may be implied by conduct, before ratification may estop a claim it must be shown that the officials acted with full knowledge of the material facts, either actually or as a matter of law. *Johnson v. Hospital Service Plan of N. J.*, 25 *N. J.* 134, 140 (1957); *Service Commercial Body Works v. Borough of Dumont*, 5 *N. J. Super.* 327, 329 (*App. Div.* 1949); *Ratajczak v. Board of Education of Perth Amboy*, 114 *N. J. L.* 577, 581 (*Sup. Ct.* 1935), affirmed on opinion below 116 *N. J. L.* 162 (*E. & A.* 1936); 10 *McQuillin, Municipal Corporations sec.* 29. 107, *p.* 442 (1950).

We cannot say as a matter of law that the plaintiff knew or should have known of the material facts. True, the practice complained of was continued over a period of almost eight years. But this is not a situation where a person unconnected with the Board and who acted in good faith is suing to recover payment. In such a case a plaintiff would be under every duty to exercise all reasonable care and the independent action of one of its employees might arguably be imputed to plaintiff. Here, plaintiff is engaged in a dispute with one of its employees. The latter was under an express statutory duty to audit and certify

all demands made upon plaintiff. If he properly exercised that duty, there would have been no "overcharges." Certainly it cannot be said to be unreasonable for plaintiff to rely upon the statements of its employee directly responsible for checking these facts.

The issue is not one of estoppel. The prior approvals by the Board are only pertinent to Hoek's contentions that the Board had in fact agreed to increase the profit margins from 10% to 20% or had ratified such increases.

The judgment of the Appellate Division is reversed insofar as it directed the entry of judgment in favor of defendant Hoek. The case is remanded to the trial court for a new trial on all issues, costs to abide that event.

*For reversal and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.