MAJOR LEAGUE BASEBALL
PROMOTION CORP., et al.,
Plaintiffs,

v.

COLOUR–TEX, INC., et al., Defendants.

Civ. A. No. 87–3249.

United States District Court,
D. New Jersey.

Jan. 24, 1990.

Richard H. Bauch, Kirsten, Simon, Friedman, Allen, Cherin & Linken, Newark, N.J. and Louis A. Columbo, Baker and Hostetler, Cleveland, Ohio, for plaintiff, Anheuser–Busch, Inc.

Max Goldman, Cherry Hill, N.J. and Alan H. Bernstein, Caesar, Rivise, Bernstein, Cohen & Pokotilow, Philadelphia, Pa., for defendants, A.C. Printed Sportswear, Inc., EDJ Inc., d/b/a Tees for Two, and Edward DiNicolantonio.

GERRY, Chief Judge.

In July of 1987, two investigators working for plaintiff Anheuser–Busch, Inc., discovered a number of counterfeit and infringing products of various copyrights and trademarks at a company known as Colour–Tex, Inc. This suit was instituted and a temporary restraining order and an ex parte seizure order pertaining to Colour–Tex were issued on August 11, 1987. The restraining order and seizure order were served and executed the following day at Colour–Tex's premises. At that time, numerous counterfeit and infringing products were seized along with some of Colour–Tex's business records. Among other things, the seized records showed that a series of transactions had occurred in the summer of 1987 between A.C. Printed Sportswear, Inc. (A.C.) and Colour–Tex. Based on Colour–Tex's business records, Busch's investigators suspected that there might be counterfeit and infringing goods at a store known as Tees For Two or Ed's Threads. After investigating Tees For Two and finding apparently counterfeit shirts at the store, Busch's investigators determined that the source of the shirts was A.C.

In August of 1987, Busch amended the underlying complaint naming as defendants A.C. Printed Sportswear, EDJ Inc., d/b/a Tees For Two, and Edward DiNicolantonio, the president and principal shareholder of A.C. The complaint as amended consists of allegations against these defendants of copyright and trademark infringement, as well as unfair competition. On August 25, 1987, this court issued a temporary restraining order and an ex parte seizure order authorizing seizures at the premises of A.C. and Tees For Two. Representatives of Busch and two United States Marshals went to A.C.'s premises on August 26, 1987, but they did not execute the seizure order due to circumstances that they learned about after arriving at A.C.'s facility.

Busch's claims against the defendants generally involve allegations that the defendants infringed a number of Busch's marks, including "Bud," "Bud Light," and "The Original Party Animal." Specifically, Busch alleges that the defendants have infringed the name and likeness of the anthropomorphic British terrier, Spuds MacKenzie, who serves as the "spokesperson" for Bud Light beer. Subsequent to the filing of the second amended complaint and the issuance of the temporary restraining and seizure orders, the defendants filed various counterclaims against Busch and two of its representatives, James L. Bikoff and Robert Holmes. The counterclaims allege a statutory cause of action for wrongful seizure in addition to common law causes of action for malicious interference with contract, civil conspiracy, malicious use of process, and intentional and negligent infliction of emotional distress. On September 6, 1988, the court dismissed the counterclaims against Mr. Bikoff and Mr. Holmes upon a motion for judgment on the pleadings. At this time, the case still consists of Busch's original claims against the defendants and the counterclaims against only Busch.

We now are presented with motions by all parties for summary judgment in their favor on all or virtually all of the claims and counterclaims. In addition, Busch has appealed a magistrate's order directing Busch to answer certain discovery requests. We will begin by articulating the standard for summary judgment, and then proceed to discuss the motions on each claim and counterclaim in turn. In our discussion, we will mention and address additional facts pertaining to particular causes of action when necessary. We will conclude by dealing with the appeal of the magistrate's discovery order.

## I. The Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" only if a reasonable jury, considering the evidence presented, could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). A party may not rest upon bare allegations to require submitting an issue to a jury, but he must present some probative evidence tending to support the claim. *Id.* at 249, 106 S.Ct. at 2510.

The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-moving party has failed to introduce evidence supporting a necessary element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the moving party can demonstrate such a failure, the burden shifts to the non-moving party to identify the portions of the record which support the allegedly unsupported element. *Id.* at 322–23, 106 S.Ct. at 2552.

"Summary judgment should only be granted, however, where there are no genuine issues of material fact that can only be properly resolved by a trier of fact because they may reasonably be resolved in favor of either party." *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1243 (3d Cir.1989). Therefore, if reasonable minds could differ as to the import and consequence of the facts presented, summary judgment should not be granted. *See id.*, citing *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511.

## II. The Printing of Shirts by Defendant A.C. Printed Sportswear

A.C. Printed Sportswear, Mr. DiNicolantonio and Busch have all moved for summary judgment on the plaintiff's major causes of action. Busch has brought various claims against the different defendants involving two incidents of alleged infringement. The first incident involves approximately one-hundred twenty shirts with Spuds MacKenzie marks which were being sold at Tees For Two, a retail store in a Pennsylvania shopping mall. Tees For Two is part of EDJ Inc., a corporation located in Atlantic City, New Jersey. Mr. DiNicolantonio is an owner and officer of EDJ Inc., and he also is an owner and officer of A.C. Printed Sportswear. Defendants Tees For Two and Mr. DiNicolantonio admit that the shirts sold at Tees For Two technically did infringe on Busch's copyrights and trademarks.

As a result of this incident, Busch has sued Tees For Two, Mr. DiNicolantonio in his capacity as an owner and officer of Tees For Two, A.C. Printed Sportswear under an alter ego or piercing the corporate veil theory, and Mr. DiNicolantonio again in his capacity as an owner and officer of A.C. Busch charges the defendants with copyright infringement under 17 U.S.C. § 501, trademark infringement under 15 U.S.C. § 1114(1), federal unfair competition or false designation of origin under 15 U.S.C. § 1125(a), and common law trademark infringement or unfair competition. The summary judgment motions involving this incident and the defendants argument that this incident of infringement was innocent, and therefore excusable, will be discussed later in our opinion.

The second incident of alleged infringement, which concerns us at present, involves the printing of Spuds MacKenzie shirts by A.C. Printed Sportswear. Mr. DiNicolantonio is joined as a defendant both personally and in his capacity as an owner and officer of A.C. As a result of this incident, Busch charges A.C. and Mr. DiNicolantonio with copyright infringement under 17 U.S.C. § 501, trademark infringement under 15 U.S.C. § 1114(1), federal unfair competition or false designation of origin under 15 U.S.C. § 1125(a), and common law trademark infringement or unfair competition. The defendants admit that they printed Spuds MacKenzie shirts employing Busch's copyrighted property and trademarks, but they argue that they had authorization to do so. On the present motions for summary judgment, the only relevant issue is whether A.C. Printed Sportswear was authorized to print Spuds MacKenzie shirts.

1. *The Causes of Action*

The federal copyright laws proscribe any unauthorized copying of an owner's copyrighted works. 17 U.S.C. § 501(a) (incorporating by reference 17 U.S.C. § 106); *see Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1113 (2d Cir. 1986). There are two elements to a copyright infringement claim: (1) the plaintiff must own a valid copyright, and (2) the defendant must have copied the plaintiff's work in the course of the defendant's business without the plaintiff's approval. *Whelan Associates v. Jaslow Dental Laboratory*, 797 F.2d 1222, 1231–32 (3d Cir. 1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). Intent or knowledge is not an element of copyright infringement. *Fitzgerald Publishing*, 807 F.2d at 1113; *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1044 (D.C.Cir.1981). If a defendant admits to using copyrighted material, that alone would make the defendant liable for copyright infringement, absent the owner's authorization. *Fitzgerald Publishing*, 807 F.2d at 1113. Since the defendants in the present case admit to printing shirts employing Busch's copyrighted property, the only issue on the

copyright infringement claim is whether A.C. Printed Sportswear was authorized to print the shirts.

The absence of authorization or consent is also an essential aspect of a trademark infringement claim. *See* 15 U.S.C. § 1114(1). A plaintiff must prove the same elements to establish either federal or common law trademark infringement. *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.*, 656 F.Supp. 449, 453 (D.N.J.1987); *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1361 (D.N.J.1981). Similarly, the identical facts would also support a common law unfair competition claim and a false designation of origin claim under 15 U.S.C. § 1125(a). *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir.1980); *Estate of Presley*, 513 F.Supp. at 1376. Common law unfair competition or trademark infringement claims and claims under 15 U.S.C. § 1125(a) cover cases where the infringed trademarks are not registered, and they allow the court more leeway to exercise its equitable powers than a federal statutory trademark infringement claim does. *See Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg. Co.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1465 (D.N.J.1985); *Estate of Presley*, 513 F.Supp. at 1376. In the present case, some of Busch's trademarks are registered and some are not.

15 U.S.C. § 1114(1) provides in relevant part:

> [A]ny person who shall, without the consent of the registrant ... use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark ... in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ... shall be liable in a civil action by the registrant....

This language also defines common law trademark infringement and unfair competition under 15 U.S.C. § 1125(a), except in these causes of action a plaintiff need only prove that he owns a trademark and not

that the trademark is registered. *See SK & F Co.*, 625 F.2d at 1065; *Holiday Inns*, 617 F.Supp. at 1464; *Estate of Presley*, 513 F.Supp. at 1361, 1376; 15 U.S.C. § 1125(a). In the present case, there is no dispute that Busch owns the trademarks in question, both registered and unregistered. In addition, the defendants admit that A.C. Printed Sportswear printed Spuds MacKenzie shirts using Busch's trademarks. As is the case with the copyright infringement claim, the only issue in Busch's trademark infringement and unfair competition claims, both federal and common law, is whether A.C. Printed Sportswear was authorized to print the allegedly infringing shirts.

## 2. *Authorization*

All of the parties to the present motions, A.C. Printed Sportswear, Mr. DiNicolantonio and Busch, agree on the operative facts surrounding the issue of authorization. However, they disagree on the legal principles which should be applied to the facts in order to resolve this case.

Busch entered into licensing agreements with a number of firms under which the licensees could produce items using Busch's trademarks and copyrighted property. One of Busch's licensees was Spencer Industries, Inc. Busch and Spencer executed a standard contract, called the First Licensing Agreement, which allows Spencer to subcontract with manufacturers for the production of Anheuser–Busch items. The First Licensing Agreement explicitly states that Spencer must get Busch's written approval of any manufacturing that Spencer subcontracts out to a third party.

Spencer apparently entered into a contract with A.C. Printed Sportswear, through a firm named Mackler, for the manufacture of shirts employing Busch's trademarks and copyrighted property, including Spuds MacKenzie images.[1] While A.C. apparently had Spencer's approval to print the Spuds MacKenzie products, it is uncontroverted that Busch never gave its written approval of Spencer's contract with the defendant as required by the First Licensing Agreement. Busch does not dispute that Spencer approved of A.C.'s work, although there is scant evidence on this point, but Busch argues that regardless of Spencer's representations A.C. infringed on its rights because Busch never authorized the work. In opposition, the defendants argue that Spencer's representations constituted the requisite authorization and, alternatively, that Busch may have given its tacit, albeit non-written approval of A.C.'s work. Since the defendants offer no palpable evidence that Busch gave its non-written authorization, both of their arguments on this issue collapse into an inquiry of whether Spencer's representations to A.C. Printed Sportswear can satisfy the consent or authorization element of the present causes of action.

The operative authorization which is an element of these causes of action is the authorization of the owner or holder of the right involved. *Fitzgerald Publishing*, 807 F.2d at 1113 (copyrights); *SK & F, Co.*, 625 F.2d at 1065 (trademarks and unfair competition); 15 U.S.C. § 1114(1); 17 U.S.C. § 501 (incorporating by reference 17 U.S.C. § 106). In light of this premise, the issue devolves into whether the defendants can be excused from liability based on Spencer's representations of authorization, despite the absence of Busch's approval.

The defendants argue that Spencer's authorization of A.C.'s work should bind Busch under an agency theory of apparent authority. In essence, the defendants claim that the licensing agreement between Busch and Spencer establishes Spencer as Busch's agent in any dealings Spencer may have with third party manufacturers.

In support of their argument, the defendants rely on the Restatement of Agency (Second) § 170, which provides:

> A disclosed or partially disclosed principal who invites third persons to rely upon the representation of an agent as to the happening of a contingency upon which the authority of the agent depends is

---

**1.** For purposes of this opinion, we will assume without further comment that a valid contract existed between A.C. Printed Sportswear and Spencer Industries for the manufacture of Spuds MacKenzie goods.

subject to liability upon contracts made with the agent by such third persons in reasonable reliance upon unauthorized and untrue representations of the agent that the contingency has happened.

The defendants argue that Spencer's alleged portrayal of Busch's approval is the type of representation on which one can justifiably rely under section 170 of the Restatement. However, section 170 is inapposite to our discussion. The language of the section, along with its accompanying illustrations and comments, clearly indicates that a principal-agent relationship must actually exist before the rule of apparent authority in section 170 can be applied. *See* Restatement of Agency (Second) § 170, illustrations and comments (1958).[2]

Furthermore, the liability of the alleged principal under an apparent authority theory flows from the acts of the principal himself because apparent authority cannot be based merely upon the representations of the alleged agent. *Wilzig v. Sisselman*, 209 N.J.Super. 25, 35, 506 A.2d 1238 (App. Div.), *cert. denied*, 104 N.J. 417, 517 A.2d 415 (1986). Therefore, in order to resolve the issue whether A.C. Printed Sportswear was authorized to print the shirts in question, we must try to understand the relationship between Busch and Spencer and the scope of authority conferred upon Spencer under that relationship.

**2.** The illustrations and comments to section 170 of the Restatement of Agency (Second) state in part:

Illustrations:

1. P tells T that A is authorized to act for P until the return of B from Europe. T asks P how he will know when B has returned from Europe. To this P replies that A will tell him. B returns from Europe. T asks A if B has returned. A replies that he has not and T thereupon enters into a transaction with A. P is bound by the transaction between T and A.

2. P, who is erecting a factory, tells T that A is his "superintendent of construction" and is authorized to contract for machinery when the building has progressed to the point where such machinery is necessary, and that A will tell him when it is necessary. A offers to contract with T for certain machinery, and T asks A if the building is ready for it. A says that it is. P is bound by the contract with T.

Comment:

The licensing agreement between Busch and Spencer expressly provides that Spencer is not an agent of Busch. Spencer is identified in the contract as an independent contractor and a licensee of Busch. In light of these facts, A.C. Printed Sportswear is properly a subcontractor or a sublicensee and not a third party who entered a contract with an agent of Busch. Since Busch did not have a principal-agent relationship with Spencer, the defendants' reliance on section 170 of the Restatement of Agency (Second) and the theory of apparent authority is misplaced.

The resolution of the issue of A.C.'s authorization emerges from the law covering the field of licensing. Under copyright law, a person is innocent of infringement if he possesses a sublicense issued by a licensee upon the due authority of the copyright owner. *Pathe Exchange v. International Alliance*, 3 F.Supp. 63, 65 (S.D.N.Y.1932); *see Costello Publishing*, 670 F.2d at 1043–44. A licensee who has failed to satisfy a condition of the license or has materially breached the licensing contract has no rights to give a sublicensee under which the sublicensee can take cover in a copyright infringement case, and therefore, both the licensee and the sublicensee can be held liable for acting without authorization and thereby infringing the licensor's copyright.[3] *Fitzgerald Publishing*, 807

a. It is not essential that there be a formal representation. The fact that the agent or servant proceeds to act in a manner which can be justified only by a determination by him of the necessary facts may be sufficient evidence of such a representation.

b. The fact that the principal manifests to a third person that the agent is to act if a contingency occurs does not of itself lead to the inference that the principal invites him to rely upon the agent's manifestation that the contingency has occurred. Thus, if, in a power of attorney, it is recited that the agent is to have authority to convey Blackacre only if Whiteacre has been previously conveyed to the principal, there is no manifestation that persons dealing with the agent can properly rely upon his statements as to the conveyance of Whiteacre.

**3.** "A copyright owner's remedies against copiers who possess a valid sublicense but have failed to satisfy a condition upon which the rights of the

F.2d at 1113; *Costello Publishing,* 670 F.2d at 1043–44. Moreover, the reasonable or good faith use of material by a sublicensee does not alone insulate the sublicensee from a claim of infringement because intent is not an element of infringement. *Fitzgerald Publishing,* 807 F.2d at 1113–14; *Costello Publishing,* 670 F.2d at 1044; *Microsoft Corp. v. Very Competitive Computer Products,* 671 F.Supp. 1250, 1256 (N.D.Cal.1987).

One who obtains authorization to reproduce copyrighted work or material may not exceed the scope of authority granted by the copyright owner. *Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14, 20 (2d Cir.1976). In light of this principle, a sublicensee's reliance on a licensing contract that authorized the licensee to grant the authority to use protected works or material to the sublicensee is irrelevant if the licensee failed to get the licensor's approval of the sublicense as required by the licensing contract. *Fitzgerald Publishing,* 807 F.2d at 1113–14. If a licensing contract requires the licensee to obtain the licensor's written approval prior to entering into a sublicensing agreement, the failure to obtain the licensor's written approval makes the sublicense invalid since it was entered into outside of the scope of the authority granted in the licensing contract. *Id.; see Gilliam,* 538 F.2d at 20–21. Therefore, both a licensee and a sublicensee are liable for acts carried out by the sublicensee which would constitute infringement of the licensor's rights when the licensor has not authorized the sublicensing agreement. *See Fitzgerald Publishing,* 807 F.2d at 1113; *Costello Publishing,* 670 F.2d at 1043–44.

In the present case, Spencer was allowed to subcontract and, in actuality, to create a sublicense for the manufacture of Busch products, but only if Spencer obtained Busch's written approval of the subcontract. Under the licensing agreement, Spencer must obtain Busch's approval of subcontracts through the execution of a Manufacturer's Agreement. The Manufacturer's Agreement requires the signatures of representatives of Busch, Spencer and the prospective third-party manufacturer, which in this case would be A.C. Printed Sportswear. In addition, the licensing agreement requires Spencer to provide Busch with the names and addresses of all firms doing manufacturing of Busch items for Spencer.

It is undisputed that no Manufacturer's Agreement was signed giving A.C. Printed Sportswear authorization to print and manufacture Busch items. It is also undisputed that Spencer never provided Busch with A.C.'s name and address. While both sides concede that Spencer apparently made a contract with A.C., it is equally clear and undisputed that Busch never gave written approval of the arrangement as required by the licensing agreement. The defendants argue that Busch may have approved of A.C.'s sublicense, even absent written approval. However, the defendants can point to no record evidence supporting this assertion, and the lack of evidence makes it merely a matter of conjecture.

Since Spencer's subcontract with A.C. was entered into outside of the scope of authority granted in Busch's licensing agreement due to the absence of Busch's written approval, A.C. was not authorized to use Busch's copyrighted works or property. In other words, Spencer failed to satisfy the written approval requirement of the licensing agreement, and therefore, Spencer had no rights to give A.C. under which the defendants can take cover in this infringement action. *See Fitzgerald Publishing,* 807 F.2d at 1113; *Costello Publishing,* 670 F.2d at 1043–44.

We find no reason why the same analysis and conclusion should not be applied to Busch's trademark infringement and unfair competition claims. As has been stated above, the same issue of authorization is the gravamen of all of these

license depend are not limited to breach of contract. Such use is without the authority of the licensor and may constitute infringement of the copyright. 3 Nimmer on Copyright, § 10.15 at 10–109." *Microsoft Corp. v. Very Competitive Computer Products,* 671 F.Supp. 1250, 1257 n. 4 (N.D.Cal.1987).

claims. In addition, intent or knowledge is not an element of either copyright or trademark infringement. *See Fitzgerald Publishing,* 807 F.2d at 1113; 15 U.S.C. § 1114(1). As a result, the undisputed facts support the conclusion that the printing of shirts by A.C. Printed Sportswear constitutes copyright infringement, trademark infringement and unfair competition because Busch did not authorize the use of its copyrighted property and marks.

### 3. *The Liability of the Various Defendants*

■ Tees For Two, A.C. Printed Sportswear and Mr. DiNicolantonio are the three defendants involved here, but only A.C. and Mr. DiNicolantonio are defendants on the claims surrounding the infringement committed by A.C. Since we have found that the printing by A.C. was infringement, A.C. is clearly liable for its own actions. Mr. DiNicolantonio is named as a defendant both personally and vicariously in his capacity as an owner and officer of A.C.

Any person who has the ability to supervise the infringing activity and has an obvious and direct financial interest in that activity or who has personally participated in that activity can be held personally liable for the infringement. *Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers,* 756 F.2d 801, 811 (11th Cir.1985); *Columbia Pictures Industries v. Redd Horne, Inc.,* 749 F.2d 154, 160 (3d Cir.1984). Corporate officers and principal shareholders can be held personally liable for infringement and unfair competition claims. *Columbia Pictures,* 749 F.2d at 160–61; *Ford Motor Co. v. B & H Supply, Inc.,* 646 F.Supp 975, 997 (D.Minn. 1986). Additionally, corporate officers who have the right and the ability to supervise and control the infringing activity can be vicariously liable for the infringing activity of the corporation. *RCA/Ariola International, Inc. v. Thomas & Grayston Co.,* 845 F.2d 773, 781 (8th Cir.1988).

In the present case, Mr. DiNicolantonio owns 90% of the stock of A.C. Printed Sportswear, and he is the president of the corporation. The defendants have admitted that Mr. DiNicolantonio is "the conscious, dominant and active force behind the actions of A.C." Clearly, there is no dispute that Mr. DiNicolantonio had the right and the ability to supervise the infringing activity of A.C. or that he had an obvious and direct financial interest in that activity. In light of his place of dominion as an owner and officer of A.C., it is appropriate to hold Mr. DiNicolantonio liable, both personally and vicariously, for A.C.'s infringing activity.

### 4. *The Defendants' Request for More Discovery and the Continuance of the Plaintiff's Summary Judgment Motions*

■ Rule 56(f) of the Federal Rules of Civil Procedure provides:

Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Under this rule, the court has discretion to determine whether a motion for summary judgment is ripe for resolution. "[W]here the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course." *Costlow v. United States,* 552 F.2d 560, 564 (3d Cir.1977). A corollary to this principle is that where the facts are in possession of the party opposing the motion for summary judgment a continuance for purposes of discovery should be denied almost as a matter of course.

The facts in question here seem to be in the possession of both parties. A.C. Printed Sportswear and Mr. DiNicolantonio were joined as defendants in this case on August 25, 1987. The deadline for the close of discovery was extended twice at the defendants' request and discovery closed on June 5, 1989, by order of the United States Magistrate.

Two years after the commencement of the suit and over three months after the close of discovery, the defendants made the current request to reconvene the depositions of various people involved with Busch and Spencer Industries. The reason given for the request is that the defendants did not realize that Busch's authorization of A.C. Printed Sportswear's work was an issue when they originally conducted discovery. However, the fact of the matter is that Busch's counsel explicitly informed the defendants' counsel on January 20, 1988 that authorization was an issue in this case. Even if the defendants had not been so informed, they should have known that authorization would be a key issue. In fact, the defendants did ask some of Busch's and Spencer's employees about manufacturing approvals during their earlier depositions.

The defendants further argue that more discovery is needed in order to trace the source of royalties paid to Busch by Spencer for approximately $40,000 in Spuds MacKenzie items. While the undisputed facts show that Busch received such royalties from Spencer, there is no record evidence either that A.C. Printed Sportswear was the source of the revenue, or that Busch was aware that A.C. Printed Sportswear was the source of the revenue. The defendants seem to be arguing that Busch's knowing acceptance of royalties generated by A.C.'s operations would constitute tacit authorization of A.C.'s actions.

We are hard pressed to follow the defendants' argument in this regard. First, it is difficult to see the relevance of Busch's acceptance of royalties, knowingly or unknowingly, to the issue of authorization. *See Kamakazi Music Corp. v. Robbins Music Corp.*, 522 F.Supp. 125, 135 (S.D.N.Y.1981), *aff'd*, 684 F.2d 228 (2d Cir.1982) (royalties tendered directly by defendant and accepted by plaintiff did not act as a confirmation of a license or as a waiver of a copyright infringement claim). Second, even if the royalties actually did come from A.C.'s activities, that fact does not mitigate against the lack of written approval which was required in order to confer proper au-

thorization upon A.C. under the licensing agreement.

In light of the passage of over two years since the suit began, the defendants' argument for a continuance is unpersuasive. We see no reason why the defendants should be allowed to forestall the disposition of the current summary judgment motions simply to ask more questions to numerous individuals who have already provided voluminous testimony in earlier depositions. The explanation for why the defendants have not been able to find any evidence of authorization after two years of discovery may be because no such facts exist. The purpose of Rule 56(f) is to level the playing field in a situation where a party moving for summary judgment is solely in possession of all of the facts. However, the rule is not intended to unnecessarily delay the timely consideration of motions when the opponents are on a level playing field, but one of them does not like the prospects for victory if the game is played and the motions are decided.

Accordingly, the defendants' request for a continuance of the present summary judgment motions in order to reconvene discovery will be denied.

### 5. *Conclusion*

For the reasons stated above, we find that there are no facts to support the inference that the defendants were authorized by Busch to print the allegedly infringing items. Due to the utter lack of record evidence to support the conclusion that the defendants did not infringe Busch's marks and copyrighted property and the presence of record evidence to support the conclusion that they did, summary judgment is appropriate. Accordingly, on the causes of action arising from A.C. Printed Sportswear's printing of allegedly counterfeit and infringing shirts, Busch's motion for summary judgment on the claims of copyright infringement, common law and federal trademark infringement, and unfair competition will be granted. The defendants' motion for summary judgment on the same claims, entitled "Defendants' Dispositive Motion No. 2—Summary Judgment on the

Second Amended Complaint," will be denied.

### III. The Shirts on Sale at Defendant Tees For Two

■ Tees For Two, Mr. DiNicolantonio and Busch have all moved for summary judgment on Busch's claims involving the shirts that were being sold at Tees For Two. As has been noted above, approximately one-hundred twenty shirts were on sale that admittedly infringed Busch's copyrights and marks. As a result of this incident, Busch has sued Tees For Two, Mr. DiNicolantonio and A.C. Printed Sportswear. Mr. DiNicolantonio was sued personally and in his capacity as an owner and officer of Tees For Two. A.C. was entered as a defendant to these claims under an alter ego or piercing the corporate veil theory. Busch states claims against the defendants for copyright infringement under 17 U.S.C. § 501, trademark infringement under 15 U.S.C. § 1114(1), federal unfair competition or false designation of origin under 15 U.S.C. § 1125(a), and common law trademark infringement or unfair competition.

The defendants' motion for summary judgment presents an interesting argument. The defendants begin by essentially admitting that no genuine issue of fact exists as to whether the activity at Tees For Two constitutes infringement. They then enter into an in-depth analysis of why this incident should be considered "innocent" and ultimately why we now should enter judgment for Busch for only $100. Busch responds to the defendants' argument with its own analysis of why Tees For Two's activity was not "innocent," and why we should not limit Busch's recovery to $100. We find that the parties' debate over the nature and the magnitude of the defendants' transgression is premature.

After liability has been established in a copyright action, the copyright owner is entitled to his own actual damages and any profits of the infringer that are attributable to the infringement. 17 U.S.C. § 504(b). Alternatively, the copyright owner may elect to recover statutory damages as provided in 17 U.S.C. § 504(c). If the infringer proves that the infringement was committed unknowingly and innocently, the court has discretion to award the copyright owner as little as $100 under the statutory damages scheme. 17 U.S.C. § 504(c).

In a trademark action, a trademark holder generally may recover actual damages, the infringer's profits and the costs of litigation. 15 U.S.C. § 1117. A trademark holder also may recover attorneys fees in exceptional cases. *Id.*

At the present time, we have not been presented with the issue of assessing damages in this case. However, we are presented with motions for summary judgment on the issue of liability for the allegedly infringing activity at Tees For Two. In their spirited argument about why they are innocent infringers, Tees For Two and Mr. DiNicolantonio fail to point to any facts that would create a genuine triable issue on their liability. The defendants actually concede liability and proceed immediately to their argument concerning damages. In contrast, Busch has shown that admittedly infringing and counterfeit shirts were on sale at Tees For Two. Therefore, no disputed issue of fact exists on the question of whether the infringement occurred.

While we do not feel compelled to address the point at present, it clearly appears that the parties have a true and valid dispute over the type of damages that should be assessed for this incident. The defendants' argument that now is the proper time for the court to find them to be innocent infringers and to award the statutory minimum in damages is incorrect for various reasons. First, it is up to Busch alone, not the court, to elect the statutory damages scheme under 17 U.S.C. § 504(c).[4]

---

**4.** We agree with the defendants in anticipating that Busch will probably elect statutory damages rather than try to prove actual damages here. This incident of infringement involves approximately one-hundred twenty counterfeit shirts, only ten to twenty of which were sold by the defendants. While it seems unlikely that Busch would spend its time and money, as well as the resources of the federal court system, to prove actual damages when the clear and expe-

Second, even if Busch had elected that form of damages award, the defendants have the burden to prove and we have the discretion to determine that they innocently infringed Busch's copyright. Third, we may still award statutory damages in excess of $100, despite a finding that the infringement was committed unknowingly. Fourth, the trademark damages provision, 15 U.S.C. § 1117, has no analogous designated minimum amount of $100 for trademark infringement. Fifth, the amount of damages which may be awarded under Busch's unfair competition and common law claims is not controlled by the statutory damages scheme for copyright infringement or even directly by a finding that the defendants' actions were innocent. Finally, a true issue of fact seems to exist as to the appropriate damages award, and that issue is not currently before the court. In light of this understanding of the defendants' argument for minimum damages, we may proceed to consider the appropriate scope for a summary judgment decree on these claims.

Busch has brought these claims against the three defendants. Busch argues that A.C. Printed Sportswear should be held liable for the infringement by Tees For Two under an alter ego or piercing the corporate veil theory. The defendants counter that only Tees For Two and Mr. DiNicolantonio can be held liable for this incident, and that A.C. is a distinct corporate entity without liability on these claims.

■ Under New Jersey law, there are two elements for piercing the corporate veil in order to impose liability on corporate principals. First, one corporation must be organized and operated as to make it a mere instrumentality of another corporation. *Mueller v. Seaboard Commercial Corp.*, 5 N.J. 28, 34–35, 73 A.2d 905 (1950); *see Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir.1988). Second, the dominant corporation must be using the subservient corporation to perpetrate

fraud, to accomplish injustice, or to circumvent the law. *Craig*, 843 F.2d at 149; *State of New Jersey, Department of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 501, 468 A.2d 150 (1983). If both of the elements are satisfied, it is proper to pierce the veil and impose liability on the dominant corporation for the actions of the subservient corporation. *Ventron Corp.*, 94 N.J. at 500–01, 468 A.2d 150.

The parties disagree on whether liability should be imposed on A.C. for the infringement by Tees For Two. Busch argues that Tees For Two and A.C. are actually one entity. Busch points to the following facts in support of its contention: both A.C. and Tees For Two are in the garment trade; both are owned by Mr. DiNicolantonio, who is also an officer of both; some items that are delivered to Tees For Two are billed to A.C.; the W–2 forms of the Tees For Two employees are issued by A.C.; the proceeds of Tees For Two and A.C. are commingled; and both file a single joint tax return. The defendants argue that A.C. and Tees For Two are distinct, and they use the following facts to support their contention: both have their own separate management, checkbooks and payrolls; the store that Tees For Two leases is owned personally by Mr. DiNicolantonio, not by A.C.; Tees For Two is in the retail market while A.C. is a manufacturer; they file a joint tax return simply to save on accounting fees; and both are incorporated independently under the law of New Jersey. We note that some of the aforementioned facts are disputed and others are not. However, for purposes of this opinion, we need not weed through these factual disputes to find the common factual ground on which a summary judgment decree could rest.

The facts relied on by the parties and Busch's argument all go to the first prong of the piercing the corporate veil standard. Even accepting Busch's facts and all of the inferences from those facts as true and

---

dient alternative of the statutory damages scheme is available, Busch still retains the right to choose actual damages instead of statutory damages for copyright infringement. Even though we would be surprised if Busch did not

elect to receive statutory damages, we are not insulted, as the defendants suggest we should be, by the fact that such tactical decisions are left to the parties during the course of litigation.

discounting the defendants' facts, the most that can be said is that A.C. dominates and controls Tees For Two. The mere presence of corporate dominance is not grounds for piercing the corporate veil, and piercing is inappropriate if the subservient corporation was incorporated and operated for legitimate business purposes. *See Craig*, 843 F.2d at 149; *Ventron Corp.*, 94 N.J. at 501, 468 A.2d 150. The defendants are correct that Busch has not set forth any facts showing that A.C. used Tees For Two to perpetrate fraud or injustice, or that Tees For Two was established for an illegitimate purpose. There are simply no facts on the record to support the inference that Tees For Two is merely a puppet which A.C. created and used to circumvent the law.[5] Therefore, the general rule of respect for distinct corporate forms should be applied, and the corporate veil cannot be pierced upon the present record in order to hold A.C. liable for the infringing activity at Tees For Two.

Neither side disputes that the incident involving the shirts on sale at Tees For Two constitutes infringement. Similarly, neither disputes that Tees For Two and Mr. DiNicolantonio are liable. In addition, Busch has failed to set forth any facts on the issue of fraudulent or unjust purpose that would support a factfinder's piercing of the corporate veil and holding A.C. Printed Sportswear liable for the infringement at Tees For Two. For these reasons, summary judgment is only appropriate on the claims against Tees For Two and Mr. DiNicolantonio. Accordingly, on the causes of action based on the sale of shirts by Tees For Two, Busch's motion for summary judgment on its claims of copyright infringement, common law and federal trademark infringement, and unfair compe-

tition will be granted as against defendants Tees For Two and Mr. DiNicolantonio, and it will be denied as against defendant A.C. Printed Sportswear. The defendants' motion for summary judgment on the same claims will be denied.[6]

## IV. The Wrongful Seizure Counterclaim

Both A.C. Printed Sportswear and Busch have moved for summary judgment on A.C.'s counterclaim for wrongful seizure. The Lanham Act, as amended in 1984, allows a party to obtain an ex parte seizure order providing for the seizure of items involved in a violation of the trademark laws, including any goods, counterfeit marks, the means of making such marks, and the records of transactions dealing with such marks. 15 U.S.C. § 1116(d)(1)(A). In light of the extraordinary nature of the ex parte seizure remedy, the statute creates a cause of action for wrongful seizure. 15 U.S.C. § 1116(d)(11). In the present case, A.C. has filed a counterclaim alleging that the conduct of Busch's representatives on August 26, 1987 constituted wrongful seizure under 15 U.S.C. § 1116(d)(11).

The facts relevant to the motions for summary judgment on this counterclaim are simple and undisputed. On August 25, 1987, Busch obtained a seizure order for A.C.'s premises pursuant to 15 U.S.C. § 1116(d)(1)(A). The following day four representatives of Busch and two United States Marshals went to A.C.'s premises to execute the seizure order. Upon their arrival, they met Mr. DiNicolantonio, who claimed that A.C. had authorization to print the Spuds MacKenzie shirts which Busch's representatives were inquiring about. After one of Busch's representatives made a

---

**5.** The mere fact that Tees For Two has committed infringement of Busch's intellectual property rights is not enough to satisfy the second prong of the piercing of the corporate veil standard. The second prong of the standard requires a showing that the major purpose, if not the sole purpose, of the subservient corporation was illegitimate. *See Ventron Corp.*, 94 N.J. at 501, 468 A.2d 150. Assuming that A.C. created and now dominates Tees For Two, the purpose of such an arrangement seemingly was not to perpetrate fraud by selling one-hundred twenty

counterfeit shirts. Busch has failed to bring forth any facts to show the requisite type of fraudulent or illegitimate purpose here, apart from the incident involving these one-hundred odd shirts.

**6.** For purposes of clarification, we note that the defendants' motion for summary judgment on these claims was made only on behalf of Tees For Two and Mr. DiNicolantonio and not on behalf of A.C. Printed Sportswear.

few telephone calls, the impending search by the United States Marshals was called off. The Marshals did not execute the seizure order, and they did not seize any items pursuant to the order. Following the personal request of one of Busch's representatives, Mr. DiNicolantonio surrendered three samples of the allegedly counterfeit shirts.

15 U.S.C. § 1116(d)(11) provides in relevant part:

A person who suffers damage by reason of a wrongful seizure under this subsection has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to recover such relief as may be appropriate, including damages for lost profits, cost of materials, loss of good will, and punitive damages in instances where the seizure was sought in bad faith, and, unless the court finds extenuating circumstances, to recover a reasonable attorney's fee.

The legislative history of the statute reveals that the term "wrongful seizure" was deliberately left undefined. Joint Statement on Trademark Counterfeiting Legislation, Senate Comm. on the Judiciary, S.R. No. 98–526, 98th Cong.2d Sess. 34–626, 628. The issue in the present case is whether a wrongful seizure under section 1116(d)(11) occurred when nothing was taken or seized pursuant to execution of the ex parte seizure order.

The legislative history indicates that the task of defining a "wrongful seizure" under the statute is left for the courts in each individual case, but it also does offer some guidance by way of three "rules of thumb":

The first is that the mere fact that a few legitimate items may have been seized does not make the seizure as a whole wrongful; otherwise, a counterfeiter could ensure that any seizure of its counterfeit merchandise would be "wrongful" simply by mingling a few genuine items with his or her inventory of fakes. The second is that a seizure will be wrongful if the applicant acted in bad faith in seeking it. For example, it would obviously constitute bad faith for an applicant to seek a seizure order in an effort to prevent the sale of legitimate merchandise at discount prices. Similarly, it would constitute bad faith for an applicant deliberately to defy a court order limiting its access to confidential documents seized from the defendant. Third, a seizure must be considered "wrongful" if the matter seized is legitimate, noninfringing merchandise. In such a case, even if plaintiff acted in good faith, the defendant should be compensated for his or her losses caused by the plaintiff's use of an ex parte process. Beyond these principles, the act leaves the definition of "wrongful seizure" to case-by-case interpretation in light of [Fed.R.Civ.P.] 65 and other precedents.

Joint Statement on Trademark Counterfeiting Legislation, *supra* at 34–628, 629. This excerpt from the legislative history aids in determining what makes a seizure "wrongful," but it provides little guidance as to what conduct constitutes the requisite "seizure" under section 1116(d)(11). Moreover, the legislative history gives no indication that Congress intended for a wrongful seizure cause of action to encompass the situation where no property was seized or taken pursuant to execution of the ex parte seizure order.

With the mandate of the legislative history in mind, we address the task of defining "wrongful seizure" in the present case. In order for a "wrongful seizure" claim to hold, it follows that a "seizure" must have occurred. Seizure is generally defined as "the act of taking possession of person or property by virtue of a warrant or by legal authority." Webster's Third New International Dictionary 2057 (1966); *see State of New Jersey v. Moriarity*, 268 F.Supp. 546, 566 (D.N.J.1967) (stating a similar definition of seizure). Alternatively, seizure has been defined as acting "to take possession of forcibly, to snatch, or to put in possession." Black's Law Dictionary (4th ed. 1968). In the context of the Fourth Amendment, a seizure occurs when there is some meaningful interference with an individual's possessory interests in the property seized. *Maryland v. Macon*, 472 U.S.

463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985); *United States v. Jackson*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).

The common definitions of seizure require that some tangible property be taken from an individual in order for a seizure to occur. The scant case law dealing with the application of section 1116(d)(11) reveals a similar understanding of how seizure is defined. It has been a prerequisite in every case to date involving wrongful seizure claims that properties were taken through execution of the ex parte seizure order. *See General Electric Co. v. Speicher*, 877 F.2d 531, 537 (7th Cir.1989); *Skierkewiecz v. Gonzalez*, 711 F.Supp. 931, 933 (N.D.Ill. 1989); *Reebok International Ltd. v. Su Youn Pak*, No. 87 Civ. 2727, 1989 WL 76225 (S.D.N.Y. June 30, 1989); *Major League Baseball Promotion Corp. v. Crump*, Civil No. 4–87–890 (D.Minn. Sept. 27, 1988); *Slazenger v. Stoller*, No. 88 C 3722, 1988 WL 87036 (N.D.Ill. Aug. 12, 1988); *Gucci Shops Inc. v. Conrad*, 6 U.S. P.Q.2d 1199, 1204, 1987 WL 47298 (N.D. Cal.1987).

*Gucci Shops Inc. v. Conrad* is analogous to the present case. In that case, the plaintiff obtained a seizure order for the defendant's premises under section 1116(d)(1)(A), but the plaintiff decided not to have United States Marshals execute the order as the statute provides. Instead, two representatives of the plaintiff called on the defendant at his premises. The defendant knew that the plaintiff had temporary restraining and seizure orders, and that United States Marshals would not be executing the seizure order at that time. After some discussion, the defendant surrendered "several hundred" allegedly counterfeit items to the plaintiff's representatives and allowed them to inspect some of his records. In dismissing the defendant's wrongful seizure counterclaim, the court stated:

> [I]t does not appear that any wrongful seizure took place. No goods were seized, documents removed, and only several hundred counterfeit and unlawful heat transfers ... were removed from

defendant's premises, after their surrender by defendant Allen.

*Gucci Shops*, 6 U.S.P.Q.2d at 1204.

The precedents, the common definitions of seizure, the brief legislative history and common sense all support the conclusion that a wrongful seizure claim cannot arise under section 1116(d)(11) unless some property has been seized or taken from the claimant through execution of a seizure order. In the present case, nothing was taken from A.C. Printed Sportswear pursuant to execution of the seizure order, and, therefore, it appears that no seizure which could be actionable under section 1116(d)(11) occurred. Since the facts are undisputed in this regard, summary judgment is appropriate.

The defendants make two arguments that must be addressed concerning why the definition of wrongful seizure in this case should be read broader, to encompass the situation where no property was seized through execution of the seizure order. Their first argument is based on the fact that Mr. DiNicolantonio gave three sample items to Busch's representatives. While the only relevant evidence on the record indicates that the United States Marshals did not execute the seizure order and seize the three samples themselves as required by the seizure execution process in 15 U.S.C. § 1116(d)(9), the defendants contend that Mr. DiNicolantonio's subsequent surrender of the items constituted a seizure within the meaning of the statute. In essence, the defendants claim that Mr. DiNicolantonio was coerced into surrendering the samples due to the circumstances surrounding the aborted execution of the seizure order, and that this coercion transforms the surrender of the samples into a seizure potentially actionable under section 1116(d)(11). The only record evidence of coercion is the actual presence of Busch's representatives and the Marshals at A.C.'s premises with the seizure order and the inferential psychological impact on Mr. DiNicolantonio due to their presence.

In the Fourth Amendment context, a voluntary surrender of items does not constitute a seizure, even absent probable cause

and a warrant. *See Schneckloth v. Busta-monte*, 412 U.S. 218, 222–27, 93 S.Ct. 2041, 2045–47, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire*, 403 U.S. 443, 489–90, 91 S.Ct. 2022, 2049–50, 29 L.Ed.2d 564 (1971). An individual presumably surrenders items to an investigator, public or private, in order to clear oneself of suspicion, and the mere fact the individual is under suspicion is not enough to transform the consensual forfeiture into an involuntary seizure. *Coolidge*, 403 U.S. at 489–90, 91 S.Ct. at 2049–50. Considering the facts on the present record, Mr. DiNicolantonio's surrender of the three samples to Busch's representatives appears voluntary. Therefore, it is difficult to see how the surrender of the samples constituted a seizure potentially actionable under section 1116(d)(11). *See Gucci Shops*, 6 U.S.P.Q.2d at 1204 (finding no seizure occurred when the defendant voluntarily surrendered items).

Our understanding is buttressed by the language of section 1116(d)(11) itself. Section 1116(d)(11) creates a cause of action "against the applicant for the order under which such seizure was made...." The statute provides that the cause of action arise from the execution of a seizure order. Even if Mr. DiNicolantonio's surrender of the samples was coerced or involuntary, it would not fall within the parameters of section 1116(d)(11) since Busch's seizure order was not executed. Accordingly, the defendants' first argument for a broader definition of wrongful seizure, as opposed to the one we are adopting, is unpersuasive.

The defendants' second argument involves the language of 15 U.S.C. § 1116(d)(4)(A). That section states:

> The court shall not grant [an application for an ex parte seizure order] unless— the person obtaining an order under this subsection provides the security determined adequate by the court for the payment of such damages as any person may be entitled to recover as a result of a wrongful seizure or wrongful attempted seizure under this subsection.

15 U.S.C. § 1116(d)(4)(A). The defendants point out that the bond provision in section 1116(d)(4)(A) refers to damages for both wrongful seizure and wrongful attempted seizure. They further suggest that the term "wrongful seizure" in section 1116(d)(11) should be defined correspondingly to encompass wrongful attempted seizures as well as wrongful seizures. Neither the statute nor the legislative history indicates whether the term "wrongful seizure" in section 1116(d)(11) encompasses both attempted seizures and actual seizures. *See* 15 U.S.C. § 1116(d); Joint Statement on Trademark Counterfeiting Legislation, *supra*.

A fundamental maxim of statutory construction is that a specific provision qualifies a more general provision and will govern, even though the general provision, standing alone, would encompass the same subject. *Trustees of Amalgamated Insurance Fund v. Geltman Industries, Inc.*, 784 F.2d 926, 930 (9th Cir.), *cert. denied*, 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986); *see Creque v. Luis*, 803 F.2d 92, 95 (3d Cir.1986). Although Congress left the task of defining the term for the courts, section 1116(d)(11) specifically creates a cause of action for wrongful *seizure* "against the applicant for the order under which such seizure *was made* ..." (emphasis added). Due to the specificity with which section 1116(d)(11) apparently requires a completed and actual seizure to have occurred, the reference to "wrongful attempted seizure" in the bond provision, section 1116(d)(4)(A), does not affect the interpretation of the term "wrongful seizure" in section 1116(d)(11). Section 1116(d)(4)(A) is a general provision that provides security to a defendant for any damages recoverable due to the ex parte seizure process, not just for damages recoverable through a statutory cause of action under section 1116(d)(11).

Further support for this interpretation of the relationship between sections 1116(d)(11) and 1116(d)(4)(A) comes from the fact that the term "wrongful attempted seizure" is conspicuously absent from the language in section 1116(d)(11). Congress must have contemplated that the ex parte seizure process could give rise to both wrongful seizures and wrongful acts short

of actual seizures, and it thereby wrote the bond provision to cover actual seizures as well as attempted seizures. However, when it chose to create a specific statutory cause of action providing for the recovery of punitive damages and attorney's fees in addition to real damages, Congress used only the term "wrongful seizure" to describe the conduct that could trigger a statutory claim. *See* 15 U.S.C. § 1116(d)(11).

The import of the omission of the term "wrongful attempted seizure" in section 1116(d)(11) is clear. If Congress had intended the conduct described in section 1116(d)(11) to be defined as broadly as the conduct described in section 1116(d)(4)(A), it would have included both the terms "wrongful seizure" and "wrongful attempted seizure" in section 1116(d)(11), just as it had done in section 1116(d)(4)(A). Accordingly, the defendants' second argument for a broader definition of wrongful seizure under section 1116(d)(11) also is unpersuasive.

■ At a minimum, an actual seizure or taking of property through the execution of a seizure order must have occurred in order for a wrongful seizure claim to arise. Since it is undisputed that no property was seized in the present case pursuant to the seizure order and that the seizure order was not executed, no material facts are in dispute on the counterclaim. No seizure occurred that could give rise to a cause of action under section 1116(d)(11). Therefore, Busch's motion for summary judgment on the wrongful seizure counterclaim will be granted, and the defendants' motion for summary judgment on the same counterclaim, entitled "Defendants' Dispositive Motion No. 1 for Summary Judgment on the Second Amended Complaint and Counterclaim," will be denied.

We need not address the defendants' arguments concerning whether Busch's conduct was "wrongful" because we find that no seizure actionable under section 1116(d)(11) has occurred.

## V. The Defendants' Remaining Counterclaims

In addition to the wrongful seizure counterclaim, the defendants have brought five other counterclaims against Busch. In turn, Busch has moved for summary judgment on each of these causes of action.

### 1. *Malicious Interference With Contract*

The defendants claim that Busch tortiously interfered with the contract between Spencer Industries and A.C. Printed Sportswear in two instances. First, the defendants argue that Busch's raid of A.C. on August 26, 1987 was an act of malicious interference which adversely affected A.C.'s contractual relationship with Spencer. Second, they also argue that Busch's termination of Spencer as a Busch licensee following the raid constituted malicious interference. We will deal first with the argument concerning the raid itself then with the argument about Busch's termination of Spencer's license.

Malicious interference with contract is the intentional doing of a wrongful act without justification or excuse. *Raymond v. Cregar*, 38 N.J. 472, 480, 185 A.2d 856 (1962). In this context, malice means intentional interference. *Id.; Norwood Easthill Associates v. Norwood Easthill Watch*, 222 N.J.Super. 378, 384, 536 A.2d 1317 (App.Div.1988). It is a simple proposition that a person cannot intentionally interfere with a contract that he knows nothing about. In order to subject someone to liability under this tort, the individual must have knowledge of the contract with which he has allegedly interfered. Restatement of Torts (Second) § 766, comment i (1977).

■ The record evidence here leads only to the conclusion that Busch had no knowledge of the contract between Spencer and A.C. when Busch obtained the seizure order and tried to raid A.C. on August 26, 1987. In depositions, the three Busch employees handling the Spencer account stated that they had no knowledge of Spencer's contract with A.C. prior to the raid. The defendants have failed to show that a genuine issue of fact exists as to Busch's knowledge about that contract. In opposing Busch's motion, the defendants rely solely on conjecture and the statement of a

Spencer employee that she knew about Spencer's contract with A.C., not that she had communicated this fact to Busch. Because Busch has pointed to specific facts to show that it was unaware of the contract between Spencer and A.C., the defendants must do more than try to impugn the integrity of Busch's witnesses and attack the truthfulness of their statements in order to survive Busch's motion for summary judgment. The only conclusion supported by the record evidence is that Busch had no knowledge of the contract prior to August 26, 1987. Therefore, the acts of obtaining the seizure order and attempting the raid cannot constitute malicious interference with the contract between Spencer and A.C.

We repeat that malicious interference with contract is the intentional doing of a wrongful act without justification or excuse. *Raymond,* 38 N.J. at 480, 185 A.2d 856. A proper justification may be the exercise of an equal or superior right. *Kurtz v. Oremland,* 33 N.J.Super. 443, 455, 111 A.2d 100 (Ch.Div.1954). In other words, something that a person has a legal right to do cannot serve as the basis for a malicious interference with contract claim when it is done. *Rothermel v. International Paper Co.,* 163 N.J.Super. 235, 244, 394 A.2d 860 (App.Div.1978), *cert. denied,* 79 N.J. 487, 401 A.2d 242 (1979). As a result, the termination of an existing contract according to its own terms cannot give rise to a malicious interference with contract claim.[7] *Borbely v. Nationwide Mutual Insurance Co.,* 547 F.Supp. 959, 976 (D.N.J.1981); *Rothermel,* 163 N.J.Super. at 244, 394 A.2d 860. Such a termination is proper justification for interfering with another contract. *Borbely,* 547 F.Supp. at 976.

■ The defendants' contend that Busch's termination of Spencer's licensing agreement maliciously interfered with

A.C.'s contract with Spencer because the termination of the licensing agreement severed A.C.'s ability to produce Spuds MacKenzie items. Spencer's authority to subcontract for this work derived from the licensing agreement with Busch and the terms of that agreement. Once the licensing agreement was terminated on August 27, 1987, Spencer's authority to subcontract with A.C. was terminated, and this seemingly interfered with the contract between Spencer and A.C. The issue here is whether Busch had justification for interfering with that contract.

The licensing agreement between Busch and Spencer explicitly states that Busch may immediately terminate any licensee "[i]f Licensee breaches any of the provisions of this Agreement prohibiting Licensee from directly or indirectly arranging for manufacture by third parties...." Ex. G, Exhibits to Statement of Material Facts, First Licensing Agreement, ¶ 19(a)(9). Busch could also terminate the agreement at will upon thirty days notice. Under the licensing agreement, Spencer was required to obtain Busch's written approval of any arrangements that Spencer made with third-party manufacturers. As we have noted above, Busch's written approval was to be embodied in a standard manufacturer's agreement signed by representatives of Busch, Spencer and the third party manufacturer.

It is undisputed that Spencer never obtained Busch's written approval of the subcontract with A.C. as required by the licensing agreement. On August 26, 1987, Busch discovered the relationship between Spencer and A.C. during its attempt to execute the seizure order at A.C.'s premises. The defendants baldly state that Busch was aware of the contract between Spencer and A.C. prior to August 26, 1987, but they cannot point to any facts in the voluminous amount of discovery to support their assertion, either directly or inferentially.

---

7. "Basic to our free enterprise system is the right to enter or to refrain from entering or continuing a contractual relationship. Rejection of an offer, or termination of a contract in accordance with its express terms, is a right the exercise of which is unencumbered by the threat of tort liability.... If one were to be

held liable in tort for rejection of an offer to contract or for termination of an existing contractual relationship according to its terms, the characteristically consensual nature of the contract relationship would be undermined." *Rothermel,* 163 N.J.Super. at 244, 394 A.2d 860.

Busch terminated Spencer as a licensee on August 27, 1987, ostensibly because Spencer had breached the licensing agreement by contracting with A.C. without getting Busch's written approval. As our reading of the licensing agreement reveals, Busch was within its legal rights in terminating the licensing agreement for that reason. In other words, Busch simply terminated its contract with Spencer according to the terms of their agreement. We noted above that such termination of a contract is ample justification for interfering with another contract. Therefore, the record evidence shows that Busch's termination of Spencer's licensing agreement cannot support a claim for malicious interference with the contract between Spencer and A.C.

The only facts set forth by the parties indicate that neither Busch's raid on A.C.'s premises nor Busch's termination of its contract with Spencer can serve as grounds for the defendants' malicious interference with contract counterclaim. Accordingly, Busch's motion for summary judgment on this counterclaim will be granted, and the defendants' motion for summary judgment on the same counterclaim will be denied.

2. *Conspiracy to Commit Wrongful Seizure*

In one of their counterclaims, the defendants allege that Busch and its employees and agents conspired to induce the court to issue temporary restraining and seizure orders in order to carry out a wrongful seizure against the defendants. On Busch's present motion for summary judgment, we need not address the facts surrounding this counterclaim because we find that Busch is entitled to summary judgment as a matter of law.

■ "The gravamen of an action in civil conspiracy is not conspiracy itself but the underlying wrong which, absent the conspiracy, would give a right of action." *Board of Education of the City of Asbury Park v. Hoek*, 38 N.J. 213, 238, 183 A.2d 633 (1962). There can be no claim for civil conspiracy when the object of the conspiracy is not actionable. *Id.* In the present case, we have found that the record evidence does not support the defendants' counterclaim for wrongful seizure. Since the alleged wrongful seizure is not actionable and we are granting summary judgment against the defendants on that counterclaim, the defendants' conspiracy counterclaim does not present a triable issue of fact. Therefore, Busch's motion for summary judgment on the defendants' conspiracy to commit wrongful seizure counterclaim will be granted.

■ Even if the defendants' wrongful seizure counterclaim was actionable, alternative grounds exist for granting Busch's motion on the conspiracy counterclaim. A corporation cannot conspire with its own officers, employees or agents who are acting within the scope of their employment. *See Bunch v. Artec International Corp.*, 559 F.Supp. 961, 970 (S.D.N.Y.1983) (applying Oregon and Pennsylvania law); *Cote v. Burroughs Wellcome Co.*, 558 F.Supp. 883, 889 (E.D.Pa.1982) (applying Virginia law); *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 618 (W.D.N.Y.1977) (applying New York law); *Exxon Corp. Wagner*, 154 N.J.Super. 538, 545, 382 A.2d 45 (App.Div.1977) (applying New Jersey law in antitrust context); 16 Am.Jur.2d, Conspiracy § 55 (1979). This rule of law follows from the idea that any acts done by a corporation's agents within the scope of their employment are seen as acts of the corporation itself.

The defendants here allege that the conspirators were Busch and its agents. The defendants have not pointed to any facts to support the proposition that Busch's agents were acting outside of the scope of their employment when they decided to pursue the seizure order against the defendants. To the contrary, the only justifiable inference from the facts presented by both sides is that Busch's agents were carrying out Busch's policies and acting well within the scope of their employment by trying to investigate and police suspected acts of counterfeiting. In this light, the act of securing and trying to execute the seizure order cannot be seen as a conspiracy between Busch and its agents because it

lacked the requisite multiplicity of parties. Accordingly, it would be appropriate to grant Busch's motion for summary judgment on the defendants' conspiracy counterclaim on the grounds that Busch could not have conspired with its agents in this regard as a matter of law.

### 3. *Malicious Use of Process*

■ The defendants' malicious use of process counterclaim alleges that Busch filed its second amended complaint without probable cause. In order to succeed on a malicious use of process claim, a party must show the existence of a special grievance, that the suit complained of was brought without reasonable or probable cause, that it was actuated by malice, and that it terminated favorably to the party asserting the claim. *Penwag Property Co. v. Landau,* 76 N.J. 595, 598, 388 A.2d 1265 (1978). If the primary suit has not been terminated, the party defending the malicious use of process claim is entitled to judgment as a matter of law. *Id.* A simple extension of these principles is that a claim for malicious use of process cannot be asserted as a counterclaim. *Kotok Building v. Charvine Co.,* 183 N.J.Super. 101, 107, 443 A.2d 260 (L.Div.1981).

Since the defendants here have asserted malicious use of process as a counterclaim while the primary suit is still pending, Busch is entitled to summary judgment on the counterclaim. Therefore, Busch's motion for summary judgment on the defendants' malicious use of process counterclaim will be granted.

### 4. *Intentional Infliction of Emotional Distress*

■ The intentional infliction of emotional distress counterclaim was brought on behalf of Mr. DiNicolantonio, and it is based on Busch's institution of the trademark seizure action against the defendants. In order to prove a claim under this cause of action, a party must prove that the opposing party engaged in outrageous conduct which was the proximate cause of the claimant's severe distress. *Buckley v. Trenton Saving Fund Society,* 111 N.J.

355, 366, 544 A.2d 857 (1988). The conduct in question must have been done with the intention both to do the act and to produce emotional distress, or it must have been done recklessly in deliberate disregard for the high probability that emotional distress would follow. *Id.* In addition, "[t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id., quoting* Restatement of Torts (Second) § 46, comment d (1965).

The touchstone of this tort is the extreme and uncommon nature of the actor's conduct. *E.g., Figured v. Paralegal Technical Services,* 231 N.J.Super. 251, 555 A.2d 663 (App.Div.1989) (insurance investigation including personal surveillance of plaintiff on two occasions found not to be outrageous); *49 Prospect Street v. Sheva Gardens,* 227 N.J.Super. 449, 547 A.2d 1134 (App.Div.1988) (conduct found to be outrageous when landlord let rent controlled apartments go without water and become vermin infested, failed to repair broken windows and locks, allowed squatters to dwell in building, failed to clean up sewage flooded mailroom, and failed to replace stolen mailboxes). The conduct must have been so severe that no reasonable man could be expected to endure it. *Figured,* 231 N.J.Super. at 256, 555 A.2d 663.

Busch's conduct simply does not rise to the level of outrageousness necessary to create a triable issue on this claim. The only action that Busch took toward the defendants was the commencement of the ex parte seizure procedure against Tees For Two and A.C. Printed Sportswear and the filing of the present suit. Mere evidence of the institution of legal proceedings is insufficient to support a finding that the resulting mental distress was so severe that no reasonable man could be expected to endure it. *See Buckley,* 111 N.J. at 367–69, 544 A.2d 857; *Figured,* 231 N.J.Super. at 254–56, 555 A.2d 663; *see also* Restatement of Torts (Second) § 46, comment g (1965) ("The actor is never liable ... where he has done no more than insist

upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."). Finding legal proceedings instituted against oneself is an instance of emotional distress that is not actionable under this tort, although it may be "one of the regrettable aggravations of living in today's society." *See Buckley*, 111 N.J. at 368, 544 A.2d 857. Accordingly, Busch's motion for summary judgment on the defendants' intentional infliction of emotional distress counterclaim will be granted, and the defendants' motion for summary judgment on the same counterclaim will be denied.

### 5. *Negligent Infliction of Emotional Distress*

The final counterclaim is brought by Mr. DiNicolantonio for the negligent infliction of emotional distress, and it is based on Busch's institution of the trademark seizure action against the defendants. Negligent infliction of emotional distress is negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a duty to exercise reasonable care. *Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 429, 561 A.2d 1122 (1989). Recovery under this tort is intended to cover the observation of shocking events that do not occur in the daily lives of most people. *Frame v. Kothari*, 115 N.J. 638, 643–44, 560 A.2d 675 (1989). "[L]iability should depend on the [actor's] foreseeing fright or shock severe enough to cause substantial injury in a person normally constituted." *Decker*, 116 N.J. at 429, 561 A.2d 1122. Foreseeability is particularly important in the tort of negligent infliction of emotional distress due to the "constant concern about the genuineness of the claim." *Id.* at 430, 561 A.2d 1122.

We must deal with the issue whether the institution of legal proceedings could foreseeably cause the type of severe shock or fright necessary to support a claim for the negligent infliction of emotional distress. In this regard, we are mindful of the policy that the public should be uninhibited in seeking redress of their grievances in the courts. *See Ackerman v. Lagano*, 172 N.J.Super. 468, 474, 412 A.2d 1054 (L.Div. 1979). In addition, we note that the tort of malicious use of process directly covers instances of wrongful institution of legal proceedings.

When one is subject to compulsion of some type by a court order or made a defendant in a suit, a person naturally would feel annoyed, irritated and even embarrassed. Such a reaction is irrefutably foreseeable; however, the conduct which causes this reaction is neither unusual nor inherently shocking in our society. The institution of legal proceedings is the manner by which we attempt to right the wrongs that we feel have befallen us. The procedural safeguards and substantive rules of law in our system act to buffer the effect of imprudent and vexatious litigation.

As everyone has an investment in the availability of the legal system for the circumstance when they are the party who feels wronged, we cannot say that a person's invocation of the legal system is odd or out of the ordinary. Since recognition of this fact is part of everyone's experience in our society, we conclude that the institution of legal proceedings could not foreseeably cause fright or shock severe enough to cause substantial injury in a person normally constituted. Mr. DiNicolantonio has complained of a type of injury that is not sufficiently enduring, severe or palpable to justify the imposition of liability for the negligent infliction of emotional distress. Therefore, Busch's motion for summary judgment on the defendants' negligent infliction of emotional distress counterclaim will be granted, and the defendants' motion for summary judgment on the same counterclaim will be denied.

### VI. Busch's Appeal From the Magistrate's Order Compelling Discovery

This appeal arises out of the defendants' attempts to obtain discovery pertaining to their wrongful seizure counterclaim. Under section 1116(d)(11), the wrongful nature of a seizure is largely controlled by the issue whether the ex parte seizure or-

der was obtained and executed in good faith. *See* 15 U.S.C. § 1116(d)(11); Joint Statement on Trademark Counterfeiting Legislation, *supra*. Throughout the case, the defendants have asserted that Busch improperly obtained the seizure order for A.C. Printed Sportswear's premises. Busch maintains that its application to the court for the order was made in good faith, and it has asserted that it will not rely on matters protected by privilege in establishing the good faith defense.

In this regard, the defendants have attempted to discover the non-privileged matters on which Busch would be relying. The United States Magistrate originally rejected the defendants' attempts to obtain this discovery because their interrogatory and document request had been inartfully drafted and had relied on a statement attributable not to Busch but to this court.[8] After the defendants redrafted their interrogatory and document request to reflect that the good faith assertions were ascribed to Busch,[9] the Magistrate ordered Busch to answer these discovery requests. Busch now appeals the order compelling discovery.

Busch argues that, under the work product doctrine, it should not be required to reveal facts on which it would rely in establishing a good faith defense to the wrongful seizure counterclaim. Busch claims its legal theory and defense strategy will necessarily be exposed if it is forced to reveal the requested information. Regardless of

the merit of Busch's position, an in depth analysis of this question is unnecessary.

We have already found that the defendants have not presented an actionable counterclaim for wrongful seizure under section 1116(d)(11) because the undisputed facts show that no seizure occurred within the meaning of the statute. On the basis of that conclusion, Busch's summary judgment motion on the wrongful seizure counterclaim will be granted. In light of the grant of summary judgment, the wrongful seizure counterclaim will be dismissed, and therefore, there is no reason to compel Busch to answer the discovery requests in question. We draw this conclusion because the interrogatory and document request only involve the now extinguished wrongful seizure counterclaim.

Accordingly, we find that compelling Busch to respond to discovery on the wrongful seizure counterclaim is moot, and the Magistrate's order of July 31, 1989, regarding the defendants' Interrogatory No. 45 and Document Request No. 33, will be vacated.

VII. Summary of Conclusions

As stated and explained in this opinion, we will dispose of the present motions in the following manner.

On the causes of action arising from the printing of allegedly counterfeit and infringing shirts by defendant A.C. Printed Sportswear, plaintiff Busch's motion for summary judgment on the claims of copy-

---

**8.** The defendants' original discovery requests state:

*Interrogatory No. 3*
With reference to Judge Gerry's statement on Page 8 of his Opinion of October 24, 1988; [sic] "However, Anheuser–Busch has stated that it does not intend to rely on privileged aspects of their actions to establish good faith," set forth all facts relating to the non-privileged aspects of Anheuser–Busch's good faith.
*Document Request No. 2*
All non-privileged documents in connection with the non-privileged aspects of Anheuser–Busch's good faith in accordance with Judge Gerry's statement on Page 8 of his Opinion of October 24, 1988.

**9.** The defendants' reworked discovery requests state:

*Interrogatory No. 45*
With respect to Anheuser–Busch's assertion to Judge Gerry and to defendants (as on page 17 of plaintiff's brief opposing defendants' appeal returnable July 15, 1988), that Anheuser–Busch shall not rely on any privileged communications to establish a good faith defense to the counterclaims of this case, set forth all facts which relate to the non-privileged aspects of Anheuser–Busch's good faith defense.
*Document Request No. 33*
All documents and things which relate to, concern, describe or show the non-privileged aspects of Anheuser–Busch's good faith defense to the counterclaims of this case, as set forth in plaintiff's response to interrogatory no. 45.

right infringement, common law and federal trademark infringement, and unfair competition will be granted. Defendants A.C. Printed Sportswear's and Mr. DiNicolantonio's motion for summary judgment on the same claims will be denied. In addition, the defendants' request for a continuance of these summary judgment motions in order to reconvene discovery will be denied.

On the causes of action arising from the sale of allegedly counterfeit and infringing products at defendant Tees For Two, plaintiff Busch's motion for summary judgment on the claims of copyright infringement, common law and federal trademark infringement, and unfair competition will be granted as against defendants Tees For Two and Mr. DiNicolantonio but denied as against defendant A.C. Defendants Tees For Two's and Mr. DiNicolantonio's motion for summary judgment on the same claims will be denied.

On the defendants' wrongful seizure counterclaim, plaintiff Busch's motion of summary judgment will be granted, and the defendants' motion for summary judgment will be denied.

On the defendants' malicious interference with contract counterclaim, plaintiff Busch's motion for summary judgment will be granted, and the defendants' motion for summary judgment will be denied.

On the defendants' conspiracy to commit wrongful seizure counterclaim, plaintiff Busch's motion for summary judgment will be granted. Busch's motion for summary judgment on the defendants' malicious use of process counterclaim also will be granted.

On both the defendants' intentional infliction of emotional distress and negligent infliction of emotional distress counterclaims, plaintiff Busch's motions for summary judgment will be granted, and the defendants' motions for summary judgment will be denied.

On plaintiff Busch's appeal of the Magistrate's order of July 31, 1989, directing Busch to answer the defendants' Interrogatory No. 45 and Document Request No. 33, the Magistrate's order will be vacated in light of the dispositions which will be entered on the other motions mentioned above.

Following the disposition of these motions, the only issue remaining will be the damages incurred by plaintiff Busch as a result of the defendants' actions.